# JONES ET UX. *v.* ALFRED H. MAYER CO. ET AL.

No. 645.  Argued April 1–2, 1968.—Decided June 17, 1968.

*Samuel H. Liberman* argued the cause for petitioners. With him on the brief were *Arthur Allen Leff* and *Samuel A. Chaitovitz.*

*Israel Treiman* argued the cause and filed a brief for respondents.

*Attorney General Clark* argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Griswold, Assistant Attorney General Pollak, Louis F. Claiborne,* and *Brian K. Landsberg.*

Briefs of *amici curiae,* urging reversal, were filed by *Thomas C. Lynch,* Attorney General, *Charles A. O'Brien,* Chief Deputy Attorney General, and *Loren Miller, Jr.,* and *Philip M. Rosten,* Deputy Attorneys General, for the State of California; by *Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Carl Levin,* Assistant Attorney General, for the State of Michigan (Civil Rights Commission); by *Norman H. Anderson,* Attorney General, *C. B. Burns, Jr.,* Special Assistant Attorney General, and *Louis C. Defeo, Jr.,* and *Deann Duff,* Assistant Attorneys General, for the Missouri Commission on Human Rights; by *Richard W. Mason, Jr., Ilus W. Davis,* and *Joseph H. McDowell* for Kansas City, Missouri, and Kansas City, Kansas; by *Leo Pfeffer* and *Melvin L. Wulf* for the American Civil Liberties Union et al.; by *Sol Rabkin, Robert L. Carter, Joseph B. Robison, Arnold Forster, Paul Hartman,* and *Beverly Coleman* for the National Committee against Discrimination in Housing et al.; by *John Ligtenberg* and *Andrew J. Leahy* for the American Federation of Teachers et al.; by *James I. Huston* for the Path Association; by *William B. Ball* for the National Catholic Conference for Interracial Justice et al.; by *Charles H. Tuttle* and *Robert Walston Chubb* for the National Council of Churches of Christ in the United States et al.; by *Edwin J. Lukas* for the American Jewish Committee et al., and by *Henry S. Reuss, pro se,* and *Phineas Indritz* for Henry S. Reuss.

Brief of *amici curiae,* urging affirmance, was filed by *George Washington Williams* and *Thomas F. Cadwalader* for the Maryland Petition Committee, Inc., et al.

MR. JUSTICE STEWART delivered the opinion of the Court.

In this case we are called upon to determine the scope and the constitutionality of an Act of Congress, 42 U. S. C. § 1982, which provides that:

> "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

On September 2, 1965, the petitioners filed a complaint in the District Court for the Eastern District of Missouri, alleging that the respondents had refused to sell them a home in the Paddock Woods community of St. Louis County for the sole reason that petitioner Joseph Lee Jones is a Negro. Relying in part upon § 1982, the petitioners sought injunctive and other relief.[1] The District Court sustained the respondents' motion to dismiss the complaint,[2] and the Court of Appeals for the Eighth Circuit affirmed, concluding that § 1982 applies only to state action and does not reach private refusals to sell.[3] We granted certiorari to consider the

---

[1] To vindicate their rights under 42 U. S. C. § 1982, the petitioners invoked the jurisdiction of the District Court to award "damages or . . . equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ." 28 U. S. C. § 1343 (4). In such cases, federal jurisdiction does not require that the amount in controversy exceed $10,000. Cf. *Douglas* v. *City of Jeannette,* 319 U. S. 157, 161; *Hague* v. *C. I. O.,* 307 U. S. 496, 507–514, 527–532.

[2] 255 F. Supp. 115.

[3] 379 F. 2d 33.

questions thus presented.[4]   For the reasons that follow, we reverse the judgment of the Court of Appeals.   We hold that § 1982 bars *all* racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment.[5]

## I.

At the outset, it is important to make clear precisely what this case does *not* involve.   Whatever else it may be, 42 U. S. C. § 1982 is not a comprehensive open housing law.   In sharp contrast to the Fair Housing Title (Title VIII) of the Civil Rights Act of 1968, Pub. L. 90–284, 82 Stat. 81, the statute in this case deals only with racial discrimination and does not address itself to discrimination on grounds of religion or national origin.[6]   It does not deal specifically with discrimination in the provision of services or facilities in connection with the sale or rental of a dwelling.[7]   It does not prohibit advertising or other representations that indicate discriminatory preferences.[8]   It does not refer explicitly to discrimination in financing arrangements [9] or in the provision of brokerage services.[10]   It does not empower

---

[4] 389 U. S. 968.

[5] Because we have concluded that the discrimination alleged in the petitioners' complaint violated a federal statute that Congress had the power to enact under the Thirteenth Amendment, we find it unnecessary ˙to decide whether that discrimination also violated the Equal Protection Clause of the Fourteenth Amendment.

[6] Contrast the Civil Rights Act of 1968, § 804 (a).

[7] Contrast § 804 (b).

[8] Contrast §§ 804 (c), (d), (e).

[9] Contrast § 805.

[10] Contrast § 806.   In noting that 42 U. S. C. § 1982 differs from the Civil Rights Act of 1968 in not dealing explicitly and exhaustively with such matters (see also nn. 7 and 9, *supra*), we intimate

a federal administrative agency to assist aggrieved parties.[11] It makes no provision for intervention by the Attorney General.[12] And, although it can be enforced by injunction,[13] it contains no provision expressly authorizing a federal court to order the payment of damages.[14]

no view upon the question whether ancillary services or facilities of this sort might in some situations constitute "property" as that term is employed in § 1982. Nor do we intimate any view upon the extent to which discrimination in the provision of such services might be barred by 42 U. S. C. § 1981, the text of which appears in n. 78, *infra*.

[11] Contrast the Civil Rights Act of 1968, §§ 808–811.

[12] Contrast § 813 (a).

[13] The petitioners in this case sought an order requiring the respondents to sell them a "Hyde Park" type of home on Lot No. 7147, or on "some other lot in [the] subdivision sufficient to accommodate the home selected . . . ." They requested that the respondents be enjoined from disposing of Lot No. 7147 while litigation was pending, and they asked for a permanent injunction against future discrimination by the respondents "in the sale of homes in the Paddock Woods subdivision." The fact that 42 U. S. C. § 1982 is couched in declaratory terms and provides no explicit method of enforcement does not, of course, prevent a federal court from fashioning an effective equitable remedy. See, *e. g., Texas & N. O. R. Co.* v. *Ry. Clerks,* 281 U. S. 548, 568–570; *Deckert* v. *Independence Corp.,* 311 U. S. 282, 288; *United States* v. *Republic Steel Corp.,* 362 U. S. 482, 491–492; *J. I. Case Co.* v. *Borak,* 377 U. S. 426, 432–435. Cf. *Ex parte Young,* 209 U. S. 123; *Griffin* v. *School Board,* 377 U. S. 218.

[14] Contrast the Civil Rights Act of 1968, § 812 (c). The complaint in this case alleged that the petitioners had "suffered actual damages in the amount of $50.00," but no facts were stated to support or explain that allegation. Upon receiving the injunctive relief to which they are entitled, see n. 13, *supra,* the petitioners will presumably be able to purchase a home from the respondents at the price prevailing at the time of the wrongful refusal in 1965— substantially less, the petitioners concede, than the current market value of the property in question. Since it does not appear that the petitioners will then have suffered any uncompensated injury, we need not decide here whether, in some circumstances, a party

Thus, although § 1982 contains none of the exemptions that Congress included in the Civil Rights Act of 1968,[15] it would be a serious mistake to suppose that § 1982 in any way diminishes the significance of the law recently enacted by Congress. Indeed, the Senate Subcommittee on Housing and Urban Affairs was informed in hearings held after the Court of Appeals had rendered its decision in this case that § 1982 might well be "a presently valid federal statutory ban against discrimination by private persons in the sale or lease of real property."[16] The Subcommittee was told, however, that even if this Court should so construe § 1982, the existence of that statute would not "eliminate the need for congressional action" to spell out "responsibility on the part of the federal government to enforce the rights it protects."[17] The point was made that, in light of the many difficulties

---

aggrieved by a violation of § 1982 might properly assert an implied right to compensatory damages. Cf. *Texas & Pacific R. Co.* v. *Rigsby,* 241 U. S. 33, 39–40; *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192, 207; *Wyandotte Transportation Co.* v. *United States,* 389 U. S. 191, 202, 204. See generally *Bell* v. *Hood,* 327 U. S. 678, 684. See also 42 U. S. C. § 1988. In no event, on the facts alleged in the present complaint, would the petitioners be entitled to punitive damages. See *Philadelphia, Wilmington, & Baltimore R. Co.* v. *Quigley,* 21 How. 202, 213–214. Cf. *Barry* v. *Edmunds,* 116 U. S. 550, 562–565; *Wills* v. *Trans World Airlines, Inc.,* 200 F. Supp. 360, 367–368. We intimate no view, however, as to what damages might be awarded in a case of this sort arising in the future under the Civil Rights Act of 1968.

[15] See §§ 803 (b), 807.

[16] Hearings on S. 1358, S. 2114, and S. 2280 before the Subcommittee on Housing and Urban Affairs of the Senate Committee on Banking and Currency, 90th Cong., 1st Sess., 229. These hearings were a frequent point of reference in the debates preceding passage of the 1968 Civil Rights Act. See, *e. g.,* 114 Cong. Rec. S1387 (Feb. 16, 1968), S1453 (Feb. 20, 1968), S1641 (Feb. 26, 1968), S1788 (Feb. 27, 1968).

[17] Hearings, *supra,* n. 16, at 229.

confronted by private litigants seeking to enforce such rights on their own, "legislation is needed to establish federal machinery for enforcement of the rights guaranteed under Section 1982 of Title 42 even if the plaintiffs in Jones v. Alfred H. Mayer Company should prevail in the United States Supreme Court." [18]

On April 10, 1968, Representative Kelly of New York focused the attention of the House upon the present case and its possible significance. She described the background of this litigation, recited the text of § 1982, and then added:

> "When the Attorney General was asked in court about the effect of the old law [§ 1982] as compared with the pending legislation which is being considered on the House floor today, he said that the scope was somewhat different, the remedies and procedures were different, and that the new law was still quite necessary." [19]

Later the same day, the House passed the Civil Rights Act of 1968. Its enactment had no effect upon § 1982 [20]

---

[18] *Id.*, at 230. See also *id.*, at 129, 162–163, 251. And see Hearings on S. 1026, S. 1318, S. 1359, S. 1362, S. 1462, H. R. 2516, and H. R. 10805 before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 416.

[19] 114 Cong. Rec. H2807 (April 10, 1968). See also *id.*, at H2808. The Attorney General of the United States stated during the oral argument in this case that the Civil Rights Act then pending in Congress "would provide open housing rights on a complicated statutory scheme, including administrative, judicial, and other sanctions for its effectuation . . . ." "Its potential for effectiveness," he added, "is probably much greater than [§ 1982] because of the sanctions and the remedies that it provides."

[20] At oral argument, the Attorney General expressed the view that, if Congress should enact the pending bill, § 1982 would not be affected in any way but "would stand independently." That is, of course, correct. The Civil Rights Act of 1968 does not mention 42 U. S. C. § 1982, and we cannot assume that Congress intended

and no effect upon this litigation,[21] but it underscored the vast differences between, on the one hand, a general statute applicable only to racial discrimination in the rental and sale of property and enforceable only by private parties acting on their own initiative, and, on the other hand, a detailed housing law, applicable to a broad range of discriminatory practices and enforceable by a complete arsenal of federal authority. Having noted these differences, we turn to a consideration of § 1982 itself.

## II.

This Court last had occasion to consider the scope of 42 U. S. C. § 1982 in 1948, in *Hurd* v. *Hodge,* 334 U. S. 24. That case arose when property owners in the District of Columbia sought to enforce racially restrictive covenants against the Negro purchasers of several homes on their block. A federal district court enforced the restrictive agreements by declaring void the deeds of the Negro purchasers. It enjoined further attempts to sell or lease them the properties in question and directed them to "remove themselves and all of their personal belongings" from the premises within 60 days. The

to effect any change, either substantive or procedural, in the prior statute. See *United States* v. *Borden Co.,* 308 U. S. 188, 198–199. See also § 815 of the 1968 Act: "Nothing in this title shall be construed to invalidate or limit any law of . . . any . . . jurisdiction in which this title shall be effective, that grants, guarantees, or protects the . . . rights . . . granted by this title . . . ."

[21] On April 22, 1968, we requested the views of the parties as to what effect, if any, the enactment of the Civil Rights Act of 1968 had upon this litigation. The parties and the Attorney General, representing the United States as *amicus curiae,* have informed us that the respondents' housing development will not be covered by the 1968 Act until January 1, 1969; that, even then, the Act will have no application to cases where, as here, the alleged discrimination occurred prior to April 11, 1968, the date on which the Act

Court of Appeals for the District of Columbia Circuit affirmed,[22] and this Court granted certiorari [23] to decide whether § 1982, then § 1978 of the Revised Statutes of 1874, barred enforcement of the racially restrictive agreements in that case.

The agreements in *Hurd* covered only two-thirds of the lots of a single city block, and preventing Negroes from buying or renting homes in that specific area would not have rendered them ineligible to do so elsewhere in the city. Thus, if § 1982 had been thought to do no more than grant Negro citizens the legal capacity to buy and rent property free of prohibitions that wholly disabled them because of their race, judicial enforcement of the restrictive covenants at issue would not have violated § 1982. But this Court took a broader view of the statute. Although the covenants could have been enforced without denying the general right of Negroes to purchase or lease real estate, the enforcement of those covenants would nonetheless have denied the Negro purchasers "the same right 'as is enjoyed by white citizens . . . to inherit, purchase, lease, sell, hold, and convey real and personal property.' " 334 U. S., at 34. That result, this Court concluded, was prohibited by

became law; and that, if the Act were deemed applicable to such cases, the petitioners' claim under it would nonetheless be barred by the 180-day limitation period of §§ 810 (b) and 812 (a).

Nor did the passage of the 1968 Act after oral argument in this case furnish a basis for dismissing the writ of certiorari as improvidently granted. *Rice* v. *Sioux City Cemetery*, 349 U. S. 70, relied upon in dissent, *post,* .at 479, was quite unlike this case, for the statute that belatedly came to the Court's attention in *Rice* reached precisely the same situations that would have been covered by a decision in this Court sustaining the petitioner's claim on the merits. The coverage of § 1982, however, is markedly different from that of the Civil Rights Act of 1968.

[22] 82 U. S. App. D. C. 180, 162 F. 2d 233.
[23] 332 U. S. 789.

§ 1982. To suggest otherwise, the Court said, "is to reject the plain meaning of language." *Ibid.*

*Hurd* v. *Hodge, supra,* squarely held, therefore, that a Negro citizen who is denied the opportunity to purchase the home he wants "[s]olely because of [his] race and color," 334 U. S., at 34, has suffered the kind of injury that § 1982 was designed to prevent. Accord, *Buchanan* v. *Warley,* 245 U. S. 60, 79; *Harmon* v. *Tyler,* 273 U. S. 668; *Richmond* v. *Deans,* 281 U. S. 704. The basic source of the injury in *Hurd* was, of course, the action of private individuals—white citizens who had agreed to exclude Negroes from a residential area. But an arm of the Government—in that case, a federal court—had assisted in the enforcement of that agreement.[24] Thus *Hurd* v. *Hodge, supra,* did not present the question whether *purely* private discrimination, unaided by any action on the part of government, would violate § 1982 if its effect were to deny a citizen the right to rent or buy property solely because of his race or color.

The only federal court (other than the Court of Appeals in this case) that has ever squarely confronted that question held that a wholly private conspiracy among white citizens to prevent a Negro from leasing a farm violated § 1982. *United States* v. *Morris,* 125 F. 322. It is true that a dictum in *Hurd* said that § 1982 was directed only toward "governmental action," 334 U. S., at 31, but neither *Hurd* nor any other case

---

[24] Compare *Harmon* v. *Tyler,* 273 U. S. 668, invalidating a New Orleans ordinance which gave legal force to private discrimination by forbidding any Negro to establish a home in a white community, or any white person to establish a home in a Negro community, "except on the written consent of a majority of the persons of the opposite race inhabiting such community or portion of the City to be affected." See *Shelley* v. *Kraemer,* 334 U. S. 1, 12.

before or since has presented that precise issue for adjudication in this Court.[25] Today we face that issue for the first time.

### III.

We begin with the language of the statute itself. In plain and unambiguous terms, § 1982 grants to all citizens, without regard to race or color, "the same right" to purchase and lease property "as is enjoyed by white citizens." As the Court of Appeals in this case evidently recognized, that right can be impaired as effec-

---

[25] Two of this Court's early opinions contain dicta to the general effect that § 1982 is limited to state action. *Virginia* v. *Rives,* 100 U. S. 313, 317–318; *Civil Rights Cases,* 109 U. S. 3, 16–17. But all that *Virginia* v. *Rives, supra,* actually *held* was that § 641 of the Revised Statutes of 1874 (derived from § 3 of the Civil Rights Act of 1866 and currently embodied in 28 U. S. C. § 1443 (1)) did not authorize the removal of a state prosecution where the defendants, without pointing to any statute discriminating against Negroes, could only assert that a denial of their rights might take place and might go uncorrected at trial. 100 U. S., at 319–322. See *Georgia* v. *Rachel,* 384 U. S. 780, 797–804. And of course the *Civil Rights Cases, supra,* which invalidated §§ 1 and 2 of the Civil Rights Act of 1875, 18 Stat. 335, did not involve the present statute at all.

It is true that a dictum in *Hurd* v. *Hodge,* 334 U. S. 24, 31, characterized *Corrigan* v. *Buckley,* 271 U. S. 323, as having "held" that "[t]he action toward which the provisions of the statute . . . [are] directed is governmental action." 334 U. S., at 31. But no such statement appears in the *Corrigan* opinion, and a careful examination of *Corrigan* reveals that it cannot be read as authority for the proposition attributed to it in *Hurd.* In *Corrigan,* suits had been brought to enjoin a threatened violation of certain restrictive covenants in the District of Columbia. The courts of the District had granted relief, see 55 App. D. C. 30, 299 F. 899, and the case reached this Court on appeal. As the opinion in *Corrigan* specifically recognized, no claim that the covenants could not validly be *enforced* against the appellants had been raised in the lower courts, and no such claim was properly before this Court. 271 U. S., at 330–331. The only question presented for decision was whether the restrictive covenants *themselves* violated the Fifth, Thirteenth, and Fourteenth Amendments, and §§ 1977, 1978, and 1979 of the Revised Statutes

tively by "those who place property on the market"[26] as by the State itself. For, even if the State and its agents lend no support to those who wish to exclude persons from their communities on racial grounds, the fact remains that, whenever property "is placed on the market for whites only, whites have a right denied to Negroes."[27] So long as a Negro citizen who wants to buy or rent a home can be turned away simply because he is not white, he cannot be said to enjoy "the *same* right . . . as is enjoyed by white citizens . . . to . . . purchase [and] lease . . . real and personal property." 42 U. S. C. § 1982. (Emphasis added.)

On its face, therefore, § 1982 appears to prohibit *all* discrimination against Negroes in the sale or rental of property—discrimination by private owners as well as discrimination by public authorities. Indeed, even the respondents seem to concede that, if § 1982 "means what it says"—to use the words of the respondents' brief— then it must encompass every racially motivated refusal

---

(now 42 U. S. C. §§ 1981, 1982, and 1983). *Ibid.* Addressing itself to that narrow question, the Court said that none of the provisions relied upon by the appellants prohibited private individuals from "enter[ing] into . . . [contracts] in respect to the control and disposition of their own property." *Id.*, at 331. Nor, added the Court, had the appellants even *claimed* that the provisions in question "had, in and of themselves, . . . [the] effect" of prohibiting such contracts. *Ibid.*

Even if *Corrigan* should be regarded as an adjudication that 42 U. S. C. § 1982 (then § 1978 of the Revised Statutes) does not prohibit private individuals from *agreeing* not to sell their property to Negroes, *Corrigan* would *not* settle the question whether § 1982 prohibits an *actual refusal to sell* to a Negro. Moreover, since the appellants in *Corrigan* had not even argued in this Court that the statute prohibited private agreements of the sort there involved, it would be a mistake to treat the *Corrigan* decision as a considered judgment even on that narrow issue.

[26] 379 F. 2d 33, 43.

[27] *Ibid.*

to sell or rent and cannot be confined to officially sanctioned segregation in housing. Stressing what they consider to be the revolutionary implications of so literal a reading of § 1982, the respondents argue that Congress cannot possibly have intended any such result. Our examination of the relevant history, however, persuades us that Congress meant exactly what it said.

## IV.

In its original form, 42 U. S. C. § 1982 was part of § 1 of the Civil Rights Act of 1866.[28] That section was cast in sweeping terms:

> "*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That all persons born in the United States and not subject to any foreign power, . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding."[29]

---

[28] Act of April 9, 1866, c. 31, § 1, 14 Stat. 27, re-enacted by § 18 of the Enforcement Act of 1870, Act of May 31, 1870, c. 114, § 18, 16 Stat. 140, 144, and codified in §§ 1977 and 1978 of the Revised Statutes of 1874, now 42 U. S. C. §§ 1981 and 1982. For the text of § 1981, see n. 78, *infra.*

[29] It is, of course, immaterial that § 1 ended with the words "any law, statute, ordinance, regulation, or custom, to the contrary not-

The crucial language for our purposes was that which guaranteed all citizens "the same right, in every State and Territory in the United States, . . . to inherit, purchase, lease, sell, hold, and convey real and personal property . . . as is enjoyed by white citizens . . . ." To the Congress that passed the Civil Rights Act of 1866, it was clear that the right to do these things might be infringed not only by "State or local law" but also by "custom, or prejudice." [30] Thus, when Congress provided in § 1 of the Civil Rights Act that the right to purchase and lease property was to be enjoyed equally throughout the United States by Negro and white citi-

---

withstanding." The phrase was obviously inserted to qualify the reference to "like punishment, pains, and penalties, and to none other," thus emphasizing the supremacy of the 1866 statute over inconsistent state or local laws, if any. It was deleted, presumably as surplusage, in § 1978 of the Revised Statutes of 1874.

[30] Several weeks before the House began its debate on the Civil Rights Act of 1866, Congress had passed a bill (S. 60) to enlarge the powers of the Freedmen's Bureau (created by Act of March 3, 1865, c. 90, 13 Stat. 507) by extending military jurisdiction over certain areas in the South where, "in consequence of any State or local law, . . . *custom, or prejudice,* any of the civil rights . . . belonging to white persons (including the right . . . to inherit, purchase, lease, sell, hold, and convey real and personal property . . .) are refused or denied to negroes . . . on account of race, color, or any previous condition of slavery or involuntary servitude . . . ." See Cong. Globe, 39th Cong., 1st Sess., 129, 209. (Emphasis added.) Both Houses had passed S. 60 (see *id.,* at 421, 688, 748, 775), and although the Senate had failed to override the President's veto (see *id.,* at 915–916, 943) the bill was nonetheless significant for its recognition that the "right to purchase" was a right that could be "refused or denied" by "custom or prejudice" as well as by "State or local law." See also the text accompanying nn. 49 and 59, *infra.* Of course an "abrogation of civil rights made 'in consequence of . . . custom, or prejudice' might as easily be perpetrated by private individuals or by unofficial community activity as by state officers armed with statute or ordinance." J. tenBroek, Equal Under Law 179 (1965 ed.).

zens alike, it plainly meant to secure that right against interference from any source whatever, whether governmental or private.[31]

Indeed, if § 1 had been intended to grant nothing more than an immunity from *governmental* interference, then much of § 2 would have made no sense at all.[32]   For that section, which provided fines and prison terms for certain

---

[31] When Congressman Bingham of Ohio spoke of the Civil Rights Act, he charged that it would duplicate the substantive scope of the bill recently vetoed by the President, see n. 30, *supra,* and that it would extend the territorial reach of that bill throughout the United States.  Cong. Globe, 39th Cong., 1st Sess., 1292.  Although the Civil Rights Act, as the dissent notes, *post,* at 457, 462, made no explicit reference to "prejudice," cf. n. 30, *supra,* the fact remains that nobody who rose to answer the Congressman disputed his basic premise that the Civil Rights Act of 1866 would prohibit every form of racial discrimination encompassed by the earlier bill the President had vetoed.  Even Senator Trumbull of Illinois, author of the vetoed measure as well as of the Civil Rights Act, had previously remarked that the latter was designed to "extend to all parts of the country," on a permanent basis, the "equal civil rights" which were to have been secured in rebel territory by the former, *id.,* at 322, to the end that *"all* the badges of servitude . . . be abolished." *Id.,* at 323. (Emphasis added.)

[32] Section 2 provided:

"That any person who, *under color of any law, statute, ordinance, regulation, or custom,* shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act, or to different punishment, pains, or penalties on account of such person having at any time been held in a condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, or by reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court."   (Emphasis added.)

For the evolution of this provision into 18 U. S. C. § 242, see *Screws* v. *United States,* 325 U. S. 91, 98–99; *United States* v. *Price,* 383 U. S. 787, 804.

individuals who deprived others of rights "secured or protected" by § 1, was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed.[33] There would, of course, have been no private violations to exempt if the only "right" granted by § 1

[33] When Congressman Loan of Missouri asked the Chairman of the House Judiciary Committee, Mr. Wilson of Iowa, "why [does] the committee limit the provisions of the second section to those who act under the color of law," Cong. Globe, 39th Cong., 1st Sess., 1120, he was obviously inquiring why the second section did not also punish those who violated the first *without* acting "under the color of law." Specifically, he asked:

"Why not let them [the penalties of § 2] apply to the whole community where the acts are committed?" *Ibid.*

Mr. Wilson's reply was particularly revealing. If, as floor manager of the bill, he had viewed acts not under color of law as not violative of § 1 at all, that would of course have been the short answer to the Congressman's query. Instead, Mr. Wilson found it necessary to explain that the Judiciary Committee did not want to make "a general criminal code for the States." *Ibid.* Hence only those who discriminated "in reference to civil rights . . . under the color of . . . local laws" were made subject to the criminal sanctions of § 2. *Ibid.*

Congress might have thought it appropriate to confine criminal punishment to state officials, oath-bound to support the supreme federal law, while allowing only civil remedies—or perhaps only preventive relief—against private violators. Or Congress might have thought that States which did not authorize abridgment of the rights declared in § 1 would themselves punish all who interfered with those rights without official authority. See, *e. g.*, Cong. Globe, 39th Cong., 1st Sess., 1758, 1785. Cf. *Civil Rights Cases*, 109 U. S. 3, 19, 24–25.

Whatever the reason, it was repeatedly stressed that the only violations "reached *and punished*" by the bill, see Cong. Globe, 39th Cong., 1st Sess., at 1294 (emphasis added), would be those "done under color of State authority." *Ibid.* It is observed in dissent, *post*, at 458, that Senator Trumbull told Senator Cowan that § 2 was directed not at "State officers especially, but [at] everybody who violates the law." That remark, however, was nothing more than a reply to Senator Cowan's charge that § 2 was "exceedingly objectionable" in singling out state judicial officers for punishment for the first time "in the history of civilized legislation." *Id.*, at 500.

had been a right to be free of discrimination by public officials. Hence the structure of the 1866 Act, as well as its language, points to the conclusion urged by the petitioners in this case—that § 1 was meant to prohibit *all* racially motivated deprivations of the rights enumerated in the statute, although only those deprivations perpetrated "under color of law" were to be criminally punishable under § 2.

In attempting to demonstrate the contrary, the respondents rely heavily upon the fact that the Congress which approved the 1866 statute wished to eradicate the recently enacted Black Codes—laws which had saddled Negroes with "onerous disabilities and burdens, and curtailed their rights . . . to such an extent that their freedom was of little value . . . ." *Slaughter-House Cases,* 16 Wall. 36, 70.[34] The respondents suggest that the only evil Congress sought to eliminate was that of racially discriminatory laws in the former Confederate States. But the Civil Rights Act was drafted to apply throughout the country,[35] and its language was far

[34] See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., at 39, 474, 516–517, 602-603, 1123-1125, 1151-1153, 1160. For the substance of the codes and their operation, see H. R. Exec. Doc. No. 118, 39th Cong., 1st Sess.; S. Exec. Doc. No. 6, 39th Cong., 2d Sess.; 1 W. Fleming, Documentary History of Reconstruction 273–312 (1906); E. McPherson, The Political History of the United States of America During the Period of Reconstruction 29–44 (1871); 2 S. Morison and H. Commager, The Growth of the American Republic 17–18 (1950 ed.); K. Stampp, The Era of Reconstruction 79–81 (1965).

[35] See n. 31, *supra.* It is true, as the dissent emphasizes, *post,* at 460, that Senator Trumbull remarked at one point that the Act "could have no operation in Massachusetts, New York, Illinois, or most of the States of the Union," whose laws did not themselves discriminate against Negroes. Cong. Globe, 39th Cong., 1st Sess., 1761. But the Senator was simply observing that the Act would "in no manner [interfere] with the . . . regulations of any State which protects all alike in their rights of person and property." *Ibid.* See also *id.,* at 476, 505, 600. That is, the Act would have

broader than would have been necessary to strike down discriminatory statutes.

That broad language, we are asked to believe, was a mere slip of the legislative pen. We disagree. For the same Congress that wanted to do away with the Black Codes *also* had before it an imposing body of evidence pointing to the mistreatment of Negroes by private individuals and unofficial groups, mistreatment unrelated to any hostile state legislation. "Accounts in newspapers North and South, Freedmen's Bureau and other official documents, private reports and correspondence were all adduced" to show that "private outrage and atrocity" were "daily inflicted on freedmen . . . ." [36] The congressional debates are replete with references to private injustices against Negroes—references to white employers who refused to pay their Negro workers,[37] white planters who agreed among themselves not to hire freed slaves without the permission of their former masters,[38] white

---

no effect upon nondiscriminatory legislation. Senator Trumbull obviously could *not* have meant that the law would apply to racial discrimination in some States but not in others, for the bill on its face applied upon its enactment "in every State and Territory in the United States," and no one disagreed when Congressman Bingham complained that, unlike Congress' recently vetoed attempt to expand the Freedmen's Bureau, see n. 30, *supra,* the Civil Rights Act would operate "in every State of the Union." *Id.,* at 1292. Nor, contrary to a suggestion made in dissent, *post,* at 460, was the Congressman speaking only of the Act's *potential* operation in any State that might enact a racially discriminatory law in the *future.* The Civil Rights Act, Congressman Bingham insisted, would "be enforced in every State . . . [at] the *present* . . . time." *Ibid.* (Emphasis added.)

[36] J. tenBroek, *supra,* n. 30, at 181. See also W. Brock, An American Crisis 124 (1963); J. McPherson, The Struggle For Equality 332 (1964); K. Stampp, *supra,* n. 34, at 75, 131-132.

[37] Cong. Globe, 39th Cong., 1st Sess., 95, 1833.

[28] *Id.,* at 1160.

citizens who assaulted Negroes[39] or who combined to drive them out of their communities.[40]

Indeed, one of the most comprehensive studies then before Congress stressed the prevalence of private hostility toward Negroes and the need to protect them from the resulting persecution and discrimination.[41] The report noted the existence of laws virtually prohibiting Negroes from owning or renting property in certain towns,[42] but described such laws as "mere isolated cases," representing "the local outcroppings of a spirit . . . found to prevail everywhere"[43]—a spirit expressed, for example,

---

[39] *Id.*, at 339-340, 1160, 1835. It is true, as the dissent notes, *post*, at 462, that some of the references to private assaults occurred during debate on the Freedmen's Bureau bill, n. 30, *supra*, but the congressional discussion proceeded upon the understanding that all discriminatory conduct reached by the Freedmen's Bureau bill would be reached as well by the Civil Rights Act. See, *e. g.*, n. 31, *supra*.

[40] *Id.*, at 1835. It is clear that these instances of private mistreatment, see also text accompanying n. 41, *infra*, were understood as illustrative of the evils that the Civil Rights Act of 1866 would correct. Congressman Eldridge of Wisconsin, for example, said this:

"Gentlemen refer us to individual cases of wrong perpetrated upon the freedmen of the South as an argument why we should extend the Federal authority into the different States to control the action of the citizens thereof. But, I ask, has not the South submitted to the altered state of things there, to the late amendment of the Constitution, to the loss of their slave property, with a cheerfulness and grace that we did not expect? . . . I deprecate all these measures because of the implication they carry upon their face that the people who have heretofore owned slaves intend to do them wrong. I do not believe it. . . . The cases of ill-treatment are exceptional cases." *Id.*, at 1156.

So it was that "opponents denied or minimized the facts asserted" but "did not contend that the [Civil Rights Act] would not reach such facts if they did exist." J. tenBroek, *supra*, n. 30, at 181.

[41] Report of C. Schurz, S. Exec. Doc. No. 2, 39th Cong., 1st Sess., 2, 17-25. See W. Brock, *supra*, n. 36, at 40-42; K. Stampp, *supra*, n. 34, at 73-75.

[42] Report of C. Schurz, *supra*, at 23-24.

[43] *Id.*, at 25.

by lawless acts of brutality directed against Negroes who traveled to areas where they were not wanted.[44] The report concluded that, even if anti-Negro legislation were "repealed in all the States lately in rebellion," equal treatment for the Negro would not yet be secured.[45]

In this setting, it would have been strange indeed if Congress had viewed its task as encompassing merely the nullification of racist laws in the former rebel States. That the Congress which assembled in the Nation's capital in December 1865 in fact had a broader vision of the task before it became clear early in the session, when three proposals to invalidate discriminatory state statutes were rejected as "too narrowly conceived."[46] From the outset it seemed clear, at least to Senator Trumbull of Illinois, Chairman of the Judiciary Committee, that stronger legislation might prove necessary. After Senator Wilson of Massachusetts had introduced his bill to strike down all racially discriminatory laws in the South,[47] Senator Trumbull said this:

> "I reported from the Judiciary Committee the second section of the [Thirteenth Amendment] for the very purpose of conferring upon Congress authority to see that the first section was carried out

---

[44] *Id.*, at 18.

[45] *Id.*, at 35.

[46] J. tenBroek, *supra*, n. 30, at 177. One of the proposals, sponsored by Senator Wilson of Massachusetts, would have declared void all "laws, statutes, acts, ordinances, rules, and regulations" establishing or maintaining in former rebel States "any inequality of civil rights and immunities" on account of "color, race, or . . . a previous condition . . . of slavery." Cong. Globe, 39th Cong., 1st Sess., 39. The other two proposals, sponsored by Senator Sumner of Massachusetts, would have struck down in the former Confederate States "all laws . . . establishing any oligarchical privileges and any distinction of rights on account of color or race" and would have required that all persons there be "recognized as equal before the law." *Id.*, at 91.

[47] See n. 46, *supra*.

in good faith . . . and I hold that under that second section Congress will have the authority, when the constitutional amendment is adopted, *not only to pass the bill of the Senator from Massachusetts, but a bill that will be much more efficient to protect the freedman in his rights.* . . . And, sir, when the constitutional amendment shall have been adopted, if the information from the South be that the men whose liberties are secured by it are deprived of the privilege to go and come when they please, *to buy and sell when they please,* to make contracts and enforce contracts, I give notice that, if no one else does, I shall introduce a bill and urge its passage through Congress that will secure to those men every one of these rights: they would not be freemen without them. *It is idle to say that a man is free who cannot go and come at pleasure, who cannot buy and sell, who cannot enforce his rights.* . . . [So] when the constitutional amendment is adopted I trust we may pass a bill, if the action of the people in the southern States should make it necessary, that will be *much more sweeping and efficient than the bill under consideration.*" [48]

---

[48] Cong. Globe, 39th Cong., 1st Sess., 43. (Emphasis added.) The dissent seeks to neutralize the impact of this quotation by noting that, prior to making the above statement, the Senator had argued that the second clause of the Thirteenth Amendment was inserted "for the purpose, and none other, of preventing State Legislatures from enslaving, under any pretense, those whom the first clause declared should be free." See *post,* at 455, 462–463. In fact, Senator Trumbull was simply replying at that point to the contention of Senator Saulsbury of Delaware that the second clause of the Thirteenth Amendment was never intended to authorize federal legislation interfering with subjects other than slavery itself. See *id.,* at 42. Senator Trumbull responded that the clause was intended to authorize *precisely* such legislation. That, "and none other," he said for emphasis, was its avowed purpose. But Senator Trumbull did *not* imply that the force of § 2 of the Thirteenth Amendment would be

Five days later, on December 18, 1865, the Secretary of State officially certified the ratification of the Thirteenth Amendment. The next day Senator Trumbull again rose to speak. He had decided, he said, that the "more sweeping and efficient" bill of which he had spoken previously ought to be enacted

> "at an early day for the purpose of quieting apprehensions in the minds of many friends of freedom lest by local legislation *or a prevailing public sentiment* in some of the States persons of the African race should continue to be oppressed and in fact deprived of their freedom . . . ." [49]

On January 5, 1866, Senator Trumbull introduced the bill he had in mind—the bill which later became the Civil Rights Act of 1866.[50] He described its objectives in terms that belie any attempt to read it narrowly:

> "Mr. President, I regard the bill to which the attention of the Senate is now called as the most important measure that has been under its consideration since the adoption of the constitutional amendment abolishing slavery. That amendment declared that all persons in the United States should be free. This measure is intended to give effect to that declaration and secure to all persons within the United States practical freedom. There is very little importance in the general declaration of abstract truths and principles unless they can be carried into effect, unless the persons who are to be

---

spent once Congress had nullified discriminatory state laws. On the contrary, he emphasized the fact that it was "for Congress to determine, and nobody else," what sort of legislation might be "appropriate" to make the Thirteenth Amendment effective. *Id.*, at 43. Cf. Part V of this opinion, *infra.*

[49] *Id.*, at 77. (Emphasis added.)
[50] *Id.*, at 129.

affected by them have some means of availing themselves of their benefits." [51]

Of course, Senator Trumbull's bill would, as he pointed out, "destroy all [the] discriminations" embodied in the Black Codes,[52] but it would do more: It would affirmatively secure for all men, whatever their race or color, what the Senator called the "great fundamental rights":

> "the right to acquire property, the right to go and come at pleasure, the right to enforce rights in the courts, to make contracts, and to inherit and dispose of property." [53]

As to those basic civil rights, the Senator said, the bill would "break down *all* discrimination between black men and white men." [54]

---

[51] *Id.*, at 474.

[52] *Ibid.* See the dissenting opinion, *post*, at 458.

[53] *Id.*, at 475.

[54] *Id.*, at 599. (Emphasis added.) Senator Trumbull later observed that his bill would add nothing to federal authority if the States would fully "perform their constitutional obligations." *Id.*, at 600. See also Senator Trumbull's remarks, *id.*, at 1758; the remarks of Senator Lane of Indiana, *id.*, at 602–603; and the remarks of Congressman Wilson of Iowa, *id.*, at 1117–1118. But it would be a serious mistake to infer from such statements any notion (see the dissenting opinion, *post*, at 460) that, so long as the States refrained from actively discriminating against Negroes, their "obligations" in this area, as Senator Trumbull and others understood them, would have been fulfilled. For the Senator's concern, it will be recalled (see text accompanying n. 49, *supra*), was that Negroes might be "oppressed and in fact deprived of their freedom" not only by hostile laws but also by "prevailing public sentiment," and he viewed his bill as necessary "unless by local legislation they [the States] provide for the real freedom of their former slaves." *Id.*, at 77. See also *id.*, at 43. And see the remarks of Congressman Lawrence of Ohio:

"Now, there are two ways in which a State may undertake to deprive citizens of these absolute, inherent, and inalienable rights: either by

That the bill would indeed have so sweeping an effect was seen as its great virtue by its friends [55] and as its great danger by its enemies [56] but was disputed by none.  Opponents of the bill charged that it would not only regulate state laws but would directly "determine the persons who [would] enjoy . . . property within the States," [57] threatening the ability of white citizens "to determine who [would] be members of [their] communit[ies] . . . ." [58] The bill's advocates did not deny the accuracy of those characterizations.  Instead, they defended the propriety of employing federal authority to deal with "the white man . . . [who] would invoke the power of local prejudice" against the Negro.[59]  Thus, when the Senate passed the Civil Rights Act on February 2, 1866,[60] it did so fully aware of the breadth of the measure it had approved.

In the House, as in the Senate, much was said about eliminating the infamous Black Codes.[61]  But, like the Senate, the House was moved by a larger objective— that of giving real content to the freedom guaranteed by the Thirteenth Amendment.  Representative Thayer of Pennsylvania put it this way:

"[W]hen I voted for the amendment to abolish slavery . . . I did not suppose that I was offer-

---

prohibitory laws, or by a failure to protect any one of them." *Id.*, at 1833.

[55] See, *e. g.*, the remarks of Senator Howard of Michigan. *Id.*, at 504.

[56] See, *e. g.*, the remarks of Senator Cowan of Pennsylvania, *id.*, at 500, and the remarks of Senator Hendricks of Indiana. *Id.*, at 601.

[57] Senator Saulsbury of Delaware. *Id.*, at 478.

[58] Senator Van Winkle of West Virginia. *Id.*, at 498.

[59] Senator Lane of Indiana. *Id.*, at 603.

[60] *Id.*, at 606–607.

[61] See, *e. g.*, *id.*, *at* 1118–1119, 1123–1125, 1151–1153, 1160.  See generally the discussion in the dissenting opinion, *post*, at 464–467.

434

ing . . . a mere paper guarantee. And when I voted for the second section of the amendment, I felt . . . certain that I had . . . given to Congress ability to protect . . . the rights which the first section gave . . . ."

"The bill which now engages the attention of the House has for its object to carry out and guaranty the reality of that great measure. It is to give to it practical effect and force. It is to prevent that great measure from remaining a dead letter upon the constitutional page of this country. . . . The events of the last four years . . . have changed [a] large class of people . . . from a condition of slavery to that of freedom. *The practical question now to be decided is whether they shall be in fact freemen. It is whether they shall have the benefit of this great charter of liberty* given to them by the American people."[62]

Representative Cook of Illinois thought that, without appropriate federal legislation, any "combination of men in [a] neighborhood [could] prevent [a Negro] from having any chance" to enjoy those benefits.[63]   To Congressman Cook and others like him, it seemed evident that, with respect to basic civil rights—including the "right to . . . purchase, lease, sell, hold, and convey . . . property," Congress must provide that "there . . . be *no* discrimination" on grounds of race or color.[64]

---

[62] *Id.*, at 1151.   (Emphasis added.)

[63] *Id.*, at 1124.

[64] *Ibid.*  (Emphasis added.)   The clear import of these remarks is in no way diminished by the heated debate, see *id.*, at 1290–1294, portions of which are quoted in the dissenting opinion, *post*, at 467–468, between Representative Bingham, opposing the bill, and Representative Shellabarger, supporting it, over the question of what *kinds* of state laws might be invalidated by § 1, a question not involved in this case.

It thus appears that, when the House passed the Civil Rights Act on March 13, 1866,[65] it did so on the same assumption that had prevailed in the Senate: It too believed that it was approving a comprehensive statute forbidding *all* racial discrimination affecting the basic civil rights enumerated in the Act.

President Andrew Johnson vetoed the Act on March 27,[66] and in the brief congressional debate that followed, his supporters characterized its reach in all-embracing terms. One stressed the fact that § 1 would confer "the right . . . to purchase . . . real estate . . . without any qualification and without any restriction whatever . . . ." [67] Another predicted, as a corollary, that the Act would preclude preferential treatment for white persons in the rental of hotel rooms and in the sale of church pews.[68] Those observations elicited no reply. On April 6 the Senate, and on April 9 the House, overrode the President's veto by the requisite majorities,[69] and the Civil Rights Act of 1866 became law.[70]

---

[65] *Id.*, at 1367. On March 15, the Senate concurred in the several technical amendments that had been made by the House. *Id.*, at 1413–1416.

[66] *Id.*, at 1679–1681.

[67] Senator Cowan of Pennsylvania. *Id.*, at 1781.

[68] Senator Davis of Kentucky. *Id.*, Appendix, at 183. Such expansive views of the Act's reach found frequent and unchallenged expression in the Nation's press. See, *e. g.*, Daily National Intelligencer (Washington, D. C.), March 24, 1866, p. 2, col. 1; New York Herald, March 29, 1866, p. 4, col. 3; Cincinnati Commercial, March 30, 1866, p. 4, col. 2; Evening Post (New York), April 7, 1866, p. 2, col. 1; Indianapolis Daily Herald, April 17, 1866, p. 2, col. 1.

[69] Cong. Globe, 39th Cong., 1st Sess., 1809, 1861.

[70] "Never before had Congress over-ridden a President on a major political issue, and there was special gratification in feeling that this had not been done to carry some matter of material interest, such as a tariff, but in the cause of disinterested justice." W. Brock, *supra,* n. 36, at 115.

In light of the concerns that led Congress to adopt it and the contents of the debates that preceded its passage, it is clear that the Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein—including the right to purchase or lease property.

Nor was the scope of the 1866 Act altered when it was re-enacted in 1870, some two years after the ratification of the Fourteenth Amendment.[71] It is quite true that some members of Congress supported the Fourteenth Amendment "in order to eliminate doubt as to the constitutional validity of the Civil Rights Act as applied to the States." *Hurd* v. *Hodge,* 334 U. S. 24, 32–33. But it certainly does not follow that the adoption of the Fourteenth Amendment or the subsequent readoption of the Civil Rights Act were meant somehow to *limit* its application to state action. The legislative history furnishes not the slightest factual basis for any such speculation, and the conditions prevailing in 1870 make it highly implausible. For by that time most, if not all, of the former Confederate States, then under the control of "reconstructed" legislatures, had formally repudiated racial discrimination, and the focus of congressional concern had clearly shifted from hostile statutes to the activities of groups like the Ku Klux Klan, operating wholly outside the law.[72]

---

[71] Section 18 of the Enforcement Act of 1870, Act of May 31, 1870, c. 114, § 18, 16 Stat. 144:

"*And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted . . . ."

[72] See *United States* v. *Mosley,* 238 U. S. 383, 387–388; *United States* v. *Price,* 383 U. S. 787, 804–805; 2 W. Fleming, Documentary History of Reconstruction 285–288 (1907); K. Stampp, *supra,* n. 34, at 145, 171, 185, 198–204; G. Stephenson, Race Distinctions in American Law 116 (1910).

Against this background, it would obviously make no sense to assume, without any historical support whatever, that Congress made a silent decision in 1870 to exempt private discrimination from the operation of the Civil Rights Act of 1866.[73] "The cardinal rule is that repeals by implication are not favored." *Posadas* v. *National City Bank,* 296 U. S. 497, 503. All Congress said in 1870 was that the 1866 law "is hereby re-enacted." That is all Congress meant.

As we said in a somewhat different setting two Terms ago, "We think that history leaves no doubt that, if we are to give [the law] the scope that its origins dictate, we must accord it a sweep as broad as its language." *United States* v. *Price,* 383 U. S. 787, 801. "We are not at liberty to seek ingenious analytical instruments," *ibid.,* to carve from § 1982 an exception for private conduct—even though its application to such conduct in the present context is without established precedent. And, as the Attorney General of the United States said at the oral argument of this case, "The fact that the statute lay partially dormant for many years cannot be held to diminish its force today."

## V.

The remaining question is whether Congress has power under the Constitution to do what § 1982 purports to do: to prohibit all racial discrimination, private and public, in the sale and rental of property. Our starting point is the Thirteenth Amendment, for it was pursuant

---

[73] The Court of Appeals in this case seems to have derived such an assumption from language in *Virginia* v. *Rives,* 100 U. S. 313, 317–318, and *Hurd* v. *Hodge,* 334 U. S. 24, 31. See 379 F. 2d 33, 39–40, 43. Both of those opinions simply asserted that, at least after its re-enactment in 1870, the Civil Rights Act of 1866 was directed only at governmental action. Neither opinion explained why that was thought to be so, and in each case the statement was merely dictum. See n. 25, *supra.*

to that constitutional provision that Congress originally enacted what is now § 1982. The Amendment consists of two parts. Section 1 states:

> "Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

Section 2 provides:

> "Congress shall have power to enforce this article by appropriate legislation."

As its text reveals, the Thirteenth Amendment "is not a mere prohibition of State laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." *Civil Rights Cases,* 109 U. S. 3, 20. It has never been doubted, therefore, "that the power vested in Congress to enforce the article by appropriate legislation," *ibid.,* includes the power to enact laws "direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not." *Id.,* at 23.[74]

Thus, the fact that § 1982 operates upon the unofficial acts of private individuals, whether or not sanctioned by state law, presents no constitutional problem. If Congress has power under the Thirteenth Amendment to eradicate conditions that prevent Negroes from buying and renting property because of their race or color, then no federal statute calculated to achieve that objective

---

[74] So it was, for example, that this Court unanimously upheld the power of Congress under the Thirteenth Amendment to make it a crime for one individual to compel another to work in order to discharge a debt. *Clyatt* v. *United States,* 197 U. S. 207.

can be thought to exceed the constitutional power of Congress simply because it reaches beyond state action to regulate the conduct of private individuals. The constitutional question in this case, therefore, comes to this: Does the authority of Congress to enforce the Thirteenth Amendment "by appropriate legislation" include the power to eliminate all racial barriers to the acquisition of real and personal property? We think the answer to that question is plainly yes.

"By its own unaided force and effect," the Thirteenth Amendment "abolished slavery, and established universal freedom." *Civil Rights Cases,* 109 U. S. 3, 20. Whether or not the Amendment *itself* did any more than that— a question not involved in this case—it is at least clear that the Enabling Clause of that Amendment empowered Congress to do much more. For that clause clothed "Congress with power to pass *all laws necessary and proper for abolishing all badges and incidents of slavery in the United States." Ibid.* (Emphasis added.)

Those who opposed passage of the Civil Rights Act of 1866 argued in effect that the Thirteenth Amendment merely authorized Congress to dissolve the legal bond by which the Negro slave was held to his master.[75] Yet many had earlier opposed the Thirteenth Amendment on the very ground that it would give Congress virtually unlimited power to enact laws for the protection of Negroes in every State.[76] And the majority leaders in Congress—who were, after all, the authors of the Thirteenth Amendment—had no doubt that its Enabling Clause contemplated the sort of positive legislation that

[75] See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., 113, 318, 476, 499, 507, 576, 600–601.

[76] See, *e. g.,* Cong. Globe, 38th Cong., 1st Sess., 1366, 2616, 2940–2941, 2962, 2986; Cong. Globe, 38th Cong., 2d Sess., 178–180, 182, 192, 195, 239, 241–242, 480–481, 529.

was embodied in the 1866 Civil Rights Act. Their chief spokesman, Senator Trumbull of Illinois, the Chairman of the Judiciary Committee, had brought the Thirteenth Amendment to the floor of the Senate in 1864. In defending the constitutionality of the 1866 Act, he argued that, if the narrower construction of the Enabling Clause were correct, then

> "the trumpet of freedom that we have been blowing throughout the land has given an 'uncertain sound,' and the promised freedom is a delusion. Such was not the intention of Congress, which proposed the constitutional amendment, nor is such the fair meaning of the amendment itself. . . . I have no doubt that under this provision . . . we may destroy all these discriminations in civil rights against the black man; and if we cannot, our constitutional amendment amounts to nothing. It was for that purpose that the second clause of that amendment was adopted, which says that Congress shall have authority, by appropriate legislation, to carry into effect the article prohibiting slavery. Who is to decide what that appropriate legislation is to be? The Congress of the United States; and it is for Congress to adopt such appropriate legislation as it may think proper, so that it be a means to accomplish the end." [77]

Surely Senator Trumbull was right. Surely Congress has the power under the Thirteenth Amendment rationally to determine what are the badges and the incidents of slavery, and the authority to translate that determination into effective legislation. Nor can we say that the determination Congress has made is an irrational

---

[77] Cong. Globe, 39th Cong., 1st Sess., 322. See also the remarks of Senator Howard of Michigan. *Id.*, at 503.

one. For this Court recognized long ago that, whatever else they may have encompassed, the badges and incidents of slavery—its "burdens and disabilities"—included restraints upon "those fundamental rights which are the essence of civil freedom, namely, the same right . . . to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens." *Civil Rights Cases*, 109 U. S. 3, 22.[78] Just as the Black Codes, enacted after the Civil

---

[78] The Court did conclude in the *Civil Rights Cases* that "the act of . . . the owner of the inn, the public conveyance or place of amusement, refusing . . . accommodation" cannot be "justly regarded as imposing any badge of slavery or servitude upon the applicant." 109 U. S., at 24. "It would be running the slavery argument into the ground," the Court thought, "to make it apply to every act of discrimination which a person may see fit to make as to the guests he will entertain, or as to the people he will take into his coach or cab or car, or admit to his concert or theatre, or deal with in other matters of intercourse or business." *Id.*, at 24–25. Mr. Justice Harlan dissented, expressing the view that "such discrimination practised by corporations and individuals in the exercise of their public or quasi-public functions is a badge of servitude the imposition of which Congress may prevent under its power, by appropriate legislation, to enforce the Thirteenth Amendment." *Id.*, at 43.

Whatever the present validity of the position taken by the majority on that issue—a question rendered largely academic by Title II of the Civil Rights Act of 1964, 78 Stat. 243 (see *Heart of Atlanta Motel* v. *United States*, 379 U. S. 241; *Katzenbach* v. *McClung*, 379 U. S. 294)—we note that the entire Court agreed upon at least one proposition: The Thirteenth Amendment authorizes Congress not only to outlaw all forms of slavery and involuntary servitude but also to eradicate the last vestiges and incidents of a society half slave and half free, by securing to all citizens, of every race and color, "the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens." 109 U. S., at 22. Cf. *id.*, at 35 (dissenting opinion).

In *Hodges* v. *United States*, 203 U. S. 1, a group of white men had terrorized several Negroes to prevent them from working in a

War to restrict the free exercise of those rights, were substitutes for the slave system, so the exclusion of Negroes from white communities became a substitute for the Black Codes. And when racial discrimination herds men

---

sawmill. The terrorizers were convicted under 18 U. S. C. § 241 (then Revised Statutes § 5508) of conspiring to prevent the Negroes from exercising the right to contract for employment, a right secured by 42 U. S. C. § 1981 (then Revised Statutes § 1977, derived from § 1 of the Civil Rights Act of 1866, see n. 28, *supra*). Section 1981 provides, in terms that closely parallel those of § 1982 (then Revised Statutes § 1978), that all persons in the United States "shall have *the same right . . . to make and enforce contracts,* to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." (Emphasis added.)

This Court reversed the conviction. The majority recognized that "one of the disabilities of slavery, one of the indicia of its existence, was a lack of power to make or perform contracts." 203 U. S., at 17. And there was no doubt that the defendants had deprived their Negro victims, on racial grounds, of the opportunity to dispose of their labor by contract. Yet the majority said that "no mere personal assault or trespass or appropriation operates to reduce the individual to a condition of slavery," *id.*, at 18, and asserted that only conduct which actually enslaves someone can be subjected to punishment under legislation enacted to enforce the Thirteenth Amendment. Contra, *United States* v. *Cruikshank,* 25 Fed. Cas. 707, 712 (No. 14,897) (dictum of Mr. Justice Bradley, on circuit), aff'd, 92 U. S. 542; *United States* v. *Morris,* 125 F. 322, 324, 330–331. Mr. Justice Harlan, joined by Mr. Justice Day, dissented. In their view, the interpretation the majority placed upon the Thirteenth Amendment was "entirely too narrow and . . . hostile to the freedom established by the supreme law of the land." 203 U. S., at 37. That interpretation went far, they thought, "towards neutralizing many declarations made as to the object of the recent Amendments of the Constitution, a common purpose of which, this court has said, was to secure to a people theretofore in servitude, the free enjoyment, without discrimination merely on account of their race, of the essential rights that appertain to American citizenship and to freedom." *Ibid.*

The conclusion of the majority in *Hodges* rested upon a concept of congressional power under the Thirteenth Amendment irrecon-

into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery.

Negro citizens, North and South, who saw in the Thirteenth Amendment a promise of freedom—freedom to "go and come at pleasure" [79] and to "buy and sell when they please" [80]—would be left with "a mere paper guarantee" [81] if Congress were powerless to assure that a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man. At the very least, the freedom that Congress is empowered to secure under the Thirteenth Amendment includes the freedom to buy whatever a white man can buy, the right to live wherever a white man can live. If Congress cannot say that being a free man means at least this much, then the Thirteenth Amendment made a promise the Nation cannot keep.

Representative Wilson of Iowa was the floor manager in the House for the Civil Rights Act of 1866. In urging that Congress had ample authority to pass the pending bill, he recalled the celebrated words of Chief Justice Marshall in *McCulloch* v. *Maryland,* 4 Wheat. 316, 421:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." [82]

"The end is legitimate," the Congressman said, "because it is defined by the Constitution itself. The end is the

---

cilable with the position taken by every member of this Court in the *Civil Rights Cases* and incompatible with the history and purpose of the Amendment itself. Insofar as *Hodges* is inconsistent with our holding today, it is hereby overruled.

[79] See text accompanying n. 48, *supra.*

[80] *Ibid.*

[81] See text accompanying n. 62, *supra.*

[82] Cong. Globe, 39th Cong., 1st Sess., 1118.

maintenance of freedom . . . . A man who enjoys the civil rights mentioned in this bill cannot be reduced to slavery. . . . This settles the appropriateness of this measure, and that settles its constitutionality." [83]

We agree. The judgment is

*Reversed.*

MR. JUSTICE DOUGLAS, concurring.

The Act of April 9, 1866, 14 Stat. 27, 42 U. S .C. § 1982, provides: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

This Act was passed to enforce the Thirteenth Amendment which in § 1 abolished "slavery" and "involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted" and in. § 2 gave Congress power "to enforce this article by appropriate legislation."

Enabling a Negro to buy and sell real and personal property is a removal of one of many badges of slavery.

> "Slaves were not considered men. . . . They could own nothing; they could make no contracts; they could hold no property, nor traffic in property; they could not hire out; they could not legally marry nor constitute families; they could not control their children; they could not appeal from their master; they could be punished at will." W. Dubois, Black Reconstruction in America 10 (1964).[1]

---

[83] *Ibid.*

[1] The cases are collected in five volumes in H. Catterall, Judicial Cases Concerning American Slavery and the Negro (1926–1937). And see 1 T. Cobb, An Inquiry into the Law of Negro Slavery, c. XIV (1858); G. Ostrander, The Rights of Man in America 1606–1861, p. 252 (1960); G. Stroud, Sketch of the Laws Relating to Slavery 45–50 (1827); J. Wheeler, Law of Slavery 190–191 (1837).

The true curse of slavery is not what it did to the black man, but what it has done to the white man. For the existence of the institution produced the notion that the white man was of superior character, intelligence, and morality. The blacks were little more than livestock— to be fed and fattened for the economic benefits they could bestow through their labors, and to be subjected to authority, often with cruelty, to make clear who was master and who slave.

Some badges of slavery remain today. While the institution has been outlawed, it has remained in the minds and hearts of many white men. Cases which have come to this Court depict a spectacle of slavery unwilling to die. We have seen contrivances by States designed to thwart Negro voting, *e. g., Lane* v. *Wilson,* 307 U. S. 268. Negroes have been excluded over and again from juries solely on account of their race, *e. g., Strauder* v. *West Virginia,* 100 U. S. 303, or have been forced to sit in segregated seats in courtrooms, *Johnson* v. *Virginia,* 373 U. S. 61. They have been made to attend segregated and inferior schools, *e. g.; Brown* v. *Board of Education,* 347 U. S. 483, or been denied entrance to colleges or graduate schools because of their color, *e. g., Pennsylvania* v. *Board of Trusts,* 353 U. S. 230; *Sweatt* v. *Painter,* 339 U. S. 629. Negroes have been prosecuted for marrying whites, *e. g., Loving* v. *Virginia,* 388 U. S. 1. They have been forced to live in segregated residential districts, *Buchanan* v. *Warley,* 245 U. S. 60, and residents of white neighborhoods have denied them entrance, *e. g., Shelley* v. *Kraemer,* 334 U. S. 1. Negroes have been forced to use segregated facilities in going about their daily lives, having been excluded from railway coaches, *Plessy* v. *Ferguson,* 163 U. S. 537; public parks, *New Orleans Park Improvement Assn.* v. *Detiege,* 358 U. S. 54; restaurants, *Lombard* v. *Louisiana,* 373 U. S. 267; public beaches, *Mayor of Baltimore* v. *Dawson,* 350 U. S. 877; municipal

golf courses, *Holmes* v. *City of Atlanta*, 350 U. S. 879; amusement parks, *Griffin* v. *Maryland*, 378 U. S. 130; buses, *Gayle* v. *Browder*, 352 U. S. 903; public libraries, *Brown* v. *Louisiana*, 383 U. S. 131. A state court judge in Alabama convicted a Negro woman of contempt of court because she refused to answer him when he addressed her as "Mary," although she had made the simple request to be called "Miss Hamilton." *Hamilton* v. *Alabama*, 376 U. S. 650.

That brief sampling of discriminatory practices, many of which continue today, stands almost as an annotation to what Frederick Douglass (1817–1895) wrote nearly a century earlier:

> "Of all the races and varieties of men which have suffered from this feeling, the colored people of this country have endured most. They can resort to no disguises which will enable them to escape its deadly aim. They carry in front the evidence which marks them for persecution. They stand at the extreme point of difference from the Caucasian race, and their African origin can be instantly recognized, though they may be several removes from the typical African race. They may remonstrate like Shylock— 'Hath not a Jew eyes? hath not a Jew hands, organs, dimensions, senses, affections, passions? fed with the same food, hurt with the same weapons, subject to the same diseases, healed by the same means, warmed and cooled by the same summer and winter, as a Christian is?'—but such eloquence is unavailing. They are Negroes—and that is enough, in the eye of this unreasoning prejudice, to justify indignity and violence. In nearly every department of American life they are confronted by this insidious influence. It fills the air. It meets them at the workshop and factory, when they apply for work. It meets them at the church, at the hotel, at the

ballot-box, and worst of all, it meets them in the jury-box. Without crime or offense against law or gospel, the colored man is the Jean Valjean of American society. He has escaped from the galleys, and hence all presumptions are against him. The workshop denies him work, and the inn denies him shelter; the ballot-box a fair vote, and the jury-box a fair trial. He has ceased to be the slave of an individual, but has in some sense become the slave of society. He may not now be bought and sold like a beast in the market, but he is the trammeled victim of a prejudice, well calculated to repress his manly ambition, paralyze his energies, and make him a dejected and spiritless man, if not a sullen enemy to society, fit to prey upon life and property and to make trouble generally." [2]

Today the black is protected by a host of civil rights laws. But the forces of discrimination are still strong.

A member of his race, duly elected by the people to a state legislature, is barred from that assembly because of his views on the Vietnam war. *Bond* v. *Floyd,* 385 U. S. 116.

Real estate agents use artifice to avoid selling "white property" to the blacks.[3] The blacks who travel the country, though entitled by law to the facilities for sleeping and dining that are offered all tourists, *Heart of Atlanta Motel* v. *United States,* 379 U. S. 241, may well learn that the "vacancy" sign does not mean what it says, especially if the motel has a swimming pool.

On entering a half-empty restaurant they may find "reserved" signs on all unoccupied tables.

---

[2] Excerpt from Frederick Douglass, The Color Line, The North American Review, June 1881, 4 The Life and Writings of Frederick Douglass 343–344 (1955).

[3] See *Kamper* v. *Department of State of New York,* 22 N. Y. 2d 690, 238 N. E. 2d 914.

The black is often barred from a labor union because of his race.[4]

He learns that the order directing admission of his children into white schools has not been obeyed "with all deliberate speed," *Brown* v. *Board of Education,* 349 U. S. 294, 301, but has been delayed by numerous stratagems and devices.[5]  State laws, at times, have even en-

---

[4] See, *e. g.,* O'Hanlon, The Case Against the Unions, Fortune, Jan. 1968, at 170.

[5] The contrivances which some States have concocted to thwart the command of our decision in *Brown* v. *Board of Education* are by now legendary. See, *e. g., Monroe* v. *Board of Commissioners,* 391 U. S. 450 (Tennessee "free-transfer" plan); *Green* v. *County School Board,* 391 U. S. 430 (Virginia school board "freedom-of-choice" plan); *Raney* v. *Board of Education,* 391 U. S. 443 (Arkansas "freedom-of-choice" plan); *Bradley* v. *School Board,* 382 U. S. 103 (allocation of faculty allegedly on a racial basis); *Griffin* v. *School Board,* 377 U. S. 218 (closing of public schools in Prince Edward County, Virginia, with tuition grants and tax concessions used to assist white children attending private segregated schools); *Goss* v. *Board of Education,* 373 U. S. 683 (Tennessee rezoning of school districts, with a transfer plan permitting transfer by students on the basis of race); *United States* v. *Jefferson County Board of Education,* 372 F. 2d 836, aff'd *en banc,* 380 F. 2d 385 (C. A. 5th Cir. 1967) ("freedom-of-choice" plans in States within the jurisdiction of the United States Court of Appeals for the Fifth Circuit); *Northcross* v. *Board of Education,* 302 F. 2d 818 (C. A. 6th Cir. 1962) (Tennessee pupil-assignment law); *Orleans Parish School Board* v. *Bush,* 242 F. 2d 156 (C. A. 5th Cir. 1957) (Louisiana pupil-assignment law); *Hall* v. *St. Helena Parish School Board,* 197 F. Supp. 649 (D. C. E. D. La. 1961), aff'd, 368 U. S. 515 (Louisiana law permitting closing of public schools, with extensive state aid going to private segregated schools); *Holmes* v. *Danner,* 191 F. Supp. 394 (D. C. M. D. Ga. 1961) (Georgia statute cutting off state funds if Negroes admitted to state university); *Aaron* v. *McKinley,* 173 F. Supp. 944 (D. C. E. D. Ark. 1959), aff'd *sub nom. Faubus* v. *Aaron,* 361 U. S. 197 (Arkansas statute cutting off state funds to integrated school districts); *James* v. *Almond,* 170 F. Supp. 331 (D. C. E. D. Va. 1959) (closing of all integrated public schools).  See also *Rogers* v. *Paul,* 382 U. S. 198; *Calhoun* v. *Latimer,* 377 U. S. 263; *Cooper* v. *Aaron,* 358 U. S. 1.

couraged discrimination in housing. *Reitman* v. *Mulkey,* 387 U. S. 369.

This recital is enough to show how prejudices, once part and parcel of slavery, still persist. The men who sat in Congress in 1866 were trying to remove some of the badges or "customs"[6] of slavery when they enacted § 1982. And, as my Brother STEWART shows, the Congress that passed the so-called Open Housing Act in 1968 did not undercut any of the grounds on which § 1982 rests.

MR. JUSTICE HARLAN, whom MR. JUSTICE WHITE joins, dissenting.

The decision in this case appears to me to be most ill-considered and ill-advised.

The petitioners argue that the respondents' racially motivated refusal to sell them a house entitles them to judicial relief on two separate grounds. First, they claim that the respondents acted in violation of 42 U. S. C. § 1982; second, they assert that the respondents' conduct amounted in the circumstances to "state action"[1] and was therefore forbidden by the Fourteenth Amendment even in the absence of any statute. The Court, without

---

[6] My Brother HARLAN's listing of some of the "customs" prevailing in the North at the time § 1982 was first enacted shows the extent of organized white discrimination against newly freed blacks. As he states, "[r]esidential segregation was the prevailing pattern almost everywhere in the North." *Post,* at 474–475. Certainly, then, it was "customary." To suggest, however, that there might be room for argument in this case (*post,* at 475, n. 65) that the discrimination against petitioners was not in some measure a part and product of this longstanding and widespread customary pattern is to pervert the problem by allowing the legal mind to draw lines and make distinctions that have no place in the jurisprudence of a nation striving to rejoin the human race.

[1] This "state action" argument emphasizes the respondents' role as housing developers exercising continuing authority over a suburban housing complex with about 1,000 inhabitants.

reaching the second ground alleged, holds that the petitioners are entitled to relief under 42 U. S. C. § 1982, and that § 1982 is constitutional as legislation appropriate to enforce the Thirteenth Amendment.

For reasons which follow, I believe that the Court's construction of § 1982 as applying to purely private action is almost surely wrong, and at the least is open to serious doubt. The issues of the constitutionality of § 1982, as construed by the Court, and of liability under the Fourteenth Amendment alone, also present formidable difficulties. Moreover, the political processes of our own era have, since the date of oral argument in this case, given birth to a civil rights statute [2] embodying "fair housing" provisions [3] which would at the end of this year make available to others, though apparently not to the petitioners themselves,[4] the type of relief which the petitioners now seek. It seems to me that this latter factor so diminishes the public importance of this case that by far the wisest course would be for this Court to refrain from decision and to dismiss the writ as improvidently granted.

## I.

I shall deal first with the Court's construction of § 1982, which lies at the heart of its opinion. That construction is that the statute applies to purely private as well as to state-authorized discrimination.

## A.

The Court's opinion focuses upon the statute's legislative history, but it is worthy of note that the precedents in this Court are distinctly opposed to the Court's view of the statute.

---

[2] The Civil Rights Act of 1968, Pub. L. 90–284, 82 Stat. 73.

[3] *Id.,* §§ 801–819.

[4] See *ante,* at 417, n. 21.

In the *Civil Rights Cases*, 109 U. S. 3, decided less than two decades after the enactment of the Civil Rights Act of 1866, from which § 1982 is derived, the Court said in dictum of the 1866 Act:

> "This law is clearly corrective in its character, intended to counteract and furnish redress against State laws and proceedings, and customs having the force of law, which sanction the wrongful acts specified. . . . The Civil Rights Bill here referred to is analogous in its character to what a law would have been under the original Constitution, declaring that the validity of contracts should not be impaired, and that if any person bound by a contract should refuse to comply with it, under color or pretence that it had been rendered void or invalid by a State law, he should be liable to an action upon it in the courts of the United States, with the addition of a penalty for setting up such an unjust and unconstitutional defence." *Id.*, at 16–17.[5]

In *Corrigan* v. *Buckley*, 271 U. S. 323, the question was whether the courts of the District of Columbia might enjoin prospective breaches of racially restrictive covenants. The Court held that it was without jurisdiction to consider the petitioners' argument that the covenant was void because it contravened the Fifth, Thirteenth, and Fourteenth Amendments and their implementing statutes. The Court reasoned, *inter alia,* that the statutes, including the immediate predecessor of § 1982,[6] were inapplicable because

> "they, like the Constitutional Amendment under whose sanction they were enacted, do not in any manner prohibit or invalidate contracts entered into

---

[5] See also *Virginia* v. *Rives,* 100 U. S. 313, 317–318.

[6] Section 1978 of the Revised Statutes.

by private individuals in respect to the control and disposition of their own property." *Id.*, at 331.[7]

In *Hurd* v. *Hodge,* 334 U. S. 24, the issue was again whether the courts of the District might enforce racially restrictive covenants. At the outset of the process of reasoning by which it held that judicial enforcement of such a covenant would violate the predecessor of § 1982, the Court said:

> "We may start with the proposition that the statute does not invalidate private restrictive agreements so long as the purposes of those agreements are achieved by the parties through voluntary adherence to the terms. The action toward which the provisions of the statute under consideration is [*sic*] directed is governmental action. Such was the holding of *Corrigan* v. *Buckley* . . . ." *Id.*, at 31.[8]

### B.

Like the Court, I begin analysis of § 1982 by examining its language. In its present form, the section provides:

> "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

The Court finds it "plain and unambiguous," *ante,* at 420, that this language forbids purely private as well as state-authorized discrimination. With all respect, I do not find it so. For me, there is an inherent ambiguity in the

---

[7] See also *Buchanan* v. *Warley,* 245 U. S. 60, 78–79.

[8] It seems to me that this passage is not dictum, as the Court terms it, *ante,* at 419 and n. 25, but a holding. For if the Court had held the covenants in question invalid as between the parties, then it would not have had to rely upon a finding of "state action."

term "right," as used in § 1982. The "right" referred to may either be a right to equal status under the law, in which case the statute operates only against state-sanctioned discrimination, or it may be an "absolute" right enforceable against private individuals. To me, the words of the statute, taken alone, suggest the former interpretation, not the latter.[9]

Further, since intervening revisions have not been meant to alter substance, the intended meaning of § 1982 must be drawn from the words in which it was originally enacted. Section 1982 originally was a part of § 1 of the Civil Rights Act of 1866, 14 Stat. 27. Sections 1 and 2 of that Act provided in relevant part:

"That all persons born in the United States and not subject to any foreign power . . . are hereby declared to be citizens of the United States; and such citizens, of every race and color . . . , shall have the same right, in every State and Territory

_____

[9] Despite the Court's view that this reading flies in the face of the "plain and unambiguous terms" of the statute, see *ante*, at 420, it is not without precedent. In the *Civil Rights Cases*, 109 U. S. 3, the Court said of identical language in the predecessor statute to § 1982:

"[C]ivil rights, such as are guaranteed by the Constitution against State aggression, cannot be impaired by the wrongful acts of individuals, unsupported by State authority . . . . The wrongful act of an individual, unsupported by any such authority, is simply a private wrong, or a crime of that individual; an invasion of the rights of the injured party, it is true . . . ; but if not sanctioned in some way by the State, or not done under State authority, his rights remain in full force, and may presumably be vindicated by resort to the laws of the State for redress. An individual cannot deprive a man of his right . . . to hold property, to buy and sell . . . ; he may, by force or fraud, interfere with the enjoyment of the right in a particular case; . . . but, unless protected in these wrongful acts by some shield of State law or State authority, he cannot destroy or injure the right . . . ." 109 U. S., at 17.

in the United States, . . . to inherit, purchase, lease, sell, hold, and convey real and personal property . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

"Sec. 2. That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by this act . . . shall be deemed guilty of a misdemeanor . . . ."

It seems to me that this original wording indicates even more strongly than the present language that § 1 of the Act (as well as § 2, which is explicitly so limited) was intended to apply only to action taken pursuant to state or community authority, in the form of a "law, statute, ordinance, regulation, or custom." [10]   And with deference I suggest that the language of § 2, taken alone, no more implies that § 2 "was carefully drafted to exempt private violations of § 1 from the criminal sanctions it imposed," see *ante,* at 425, than it does that § 2 was carefully drafted to enforce all of the rights secured by § 1.

## C.

The Court rests its opinion chiefly upon the legislative history of the Civil Rights Act of 1866.   I shall endeavor to show that those debates do not, as the Court would have it, overwhelmingly support the result reached by the Court, and in fact that a contrary conclusion may equally well be drawn.   I shall consider the legislative

---

[10] The Court does not claim that the deletion from § 1 of the statute, in 1874, of the words "any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding" was intended to have any substantive effect.   See *ante,* at 422, n. 29.

history largely in chronological sequence, dealing separately with the Senate and House debates.

The First Session of the Thirty-ninth Congress met on December 4, 1865, some six months after the preceding Congress had sent to the States the Thirteenth Amendment, and a few days before word was received of that Amendment's ratification. On December 13, Senator Wilson introduced a bill which would have invalidated all laws in the former rebel States which discriminated among persons as to civil rights on the basis of color, and which would have made it a misdemeanor to enact or enforce such a statute.[11] On the same day, Senator Trumbull said with regard to Senator Wilson's proposal:

> "The bill does not go far enough, if what we have been told to-day in regard to the treatment of freedmen in the southern States is true. . . . [U]ntil [the Thirteenth Amendment] is adopted there may be some question . . . as to the authority of Congress to pass such a bill as this, but after the adoption of the constitutional amendment there can be none.
>
> "The second clause of that amendment was inserted for some purpose, and I would like to know . . . for what purpose? Sir, for the purpose, and none other, of preventing State Legislatures from enslaving, under any pretense, those whom the first clause declared should be free."[12]

Senator Trumbull then indicated that he would introduce separate bills to enlarge the powers of the recently founded Freedmen's Bureau and to secure the freedmen in their civil rights, both bills in his view being authorized by the second clause of the Thirteenth Amendment.[13]

---

[11] See Cong. Globe, 39th Cong., 1st Sess., 39–42.

[12] *Id.*, at 43.

[13] See *ibid.*

Since he had just stated that the purpose of that clause was to enable Congress to nullify acts of the state legislatures, it seems inferable that this was also to be the aim of the promised bills.

On January 5, Senator Trumbull introduced both the Freedmen's bill and the civil rights bill.[14] The Freedmen's bill would have strengthened greatly the existing system by which agents of the Freedmen's Bureau exercised protective supervision over freedmen wherever they were present in large numbers. *Inter alia,* the Freedmen's bill would have permitted the President, acting through the Bureau, to extend "military protection and jurisdiction" over all cases in which persons in the former rebel States were

> "in consequence of any State or local law, ordinance, police or other regulation, custom, or prejudice, [denied or refused] any of the civil rights or immunities belonging to white persons, including the right . . . to inherit, purchase, lease, sell, hold and convey real and personal property, . . . on account of race . . . ."[15]

The next section of the Freedmen's bill provided that the agents of the Freedmen's Bureau might try and convict of a misdemeanor any person who deprived another of such rights on account of race and "under color of any State or local law, ordinance, police, or other regulation or custom . . . ." Thus, the Freedmen's bill, which was generally limited in its application to the Southern States and which was correspondingly more sweeping in its pro-

---

[14] See Cong. Globe, 39th Cong., 1st Sess., 129.

[15] Freedmen's bill, § 7. The text of the bill may be found in E. McPherson, The Political History of the United States of America During the Period of Reconstruction 72 (1871). The Freedmen's bill was passed by both the Senate and the House, but the Senate failed to override the President's veto. See Cong. Globe, 39th Cong., 1st Sess., 421, 688, 742, 748, 775, 915–916, 943.

tection of the freedmen than the civil rights bill,[16] defined both the rights secured and the denials of those rights which were criminally punishable in terms of acts done under the aegis of a State or locality. The only significant distinction was that denials which occurred "in consequence of a State or local . . . prejudice" would have entitled the victim to military protection but would not have been criminal. In the corresponding section of the companion and generally parallel civil rights bill, which was to be effective throughout the Nation, the reference to "prejudice" was omitted from the rights-defining section. This would seem to imply that the more widely applicable civil rights bill was meant to provide protection only against those discriminations which were legitimated by a state or community sanction sufficiently powerful to deserve the name "custom."

The form of the Freedmen's bill also undercuts the Court's argument, *ante*, at 424, that if § 1 of the Civil Rights Act were construed as extending only to "state action," then "much of § 2 [which clearly was so limited] would have made no sense at all." For the similar structure of the companion Freedmen's bill, drafted by the same hand and largely parallel in structure, would seem to confirm that the limitation to "state action" was deliberate.

The civil rights bill was debated intermittently in the Senate from January 12, 1866, until its eventual

---

[16] Section 7 of the Freedmen's bill would have permitted the President to extend "military protection and jurisdiction" over all cases in which the specified rights were denied, while § 3 of the Civil Rights Act merely gave the federal courts concurrent jurisdiction over such actions. Section 8 of the Freedmen's bill would have allowed agents of the Freedmen's Bureau to try and convict those who violated the bill's criminal provisions, while § 3 of the Civil Rights Act only gave the federal courts exclusive jurisdiction over such actions.

passage over the President's veto on April 6. In the course of the debates, Senator Trumbull, who was by far the leading spokesman for the bill, made a number of statements which can only be taken to mean that the bill was aimed at "state action" alone. For example, on January 29, 1866, Senator Trumbull began by citing a number of recently enacted Southern laws depriving men of rights named in the bill. He stated that "[t]he purpose of the bill under consideration is to destroy *all these discriminations,* and carry into effect the constitutional amendment." [17] Later the same day, Senator Trumbull quoted § 2 of the bill in full, and said:

> "This is the valuable section of the bill so far as protecting the rights of freedmen is concerned. . . . When it comes to be understood in all parts of the United States that *any person* who shall deprive another of *any right* . . . in consequence of his color or race will expose himself to fine and imprisonment, I think such acts will soon cease." [18]

These words contain no hint that the "rights" protected by § 2 were intended to be any less broad than those secured by § 1. Of course, § 2 plainly extended only to "state action." That Senator Trumbull viewed §§ 1 and 2 as co-extensive appears even more clearly from his answer the following day when asked by Senator Cowan whether there was "not a provision [in the bill] by which State officers are to be punished?" Senator Trumbull replied: "Not State officers especially, but *everybody who violates the law. It is the intention to punish everybody who violates the law."* [19]

---

[17] Cong. Globe, 39th Cong., 1st Sess., 474. (Emphasis added.)

[18] *Id.,* at 475. (Emphasis added.)

[19] *Id.,* at 500. (Emphasis added.) The *Civil Rights Cases,* 109 U. S. 3, suggest how Senator Trumbull might have expected § 2 to

On January 29, Senator Trumbull also uttered the first of several remarkably similar and wholly unambiguous statements which indicated that the bill was aimed only at "state action." He said:

"[This bill] may be assailed as drawing to the Federal Government powers that properly belong to 'States'; but I apprehend, rightly considered, it is not obnoxious to that objection. *It will have no operation in any State where the laws are equal, where all persons have the same civil rights without regard to color or race. It will have no operation in the State of Kentucky when her slave code and all her laws discriminating between persons on account of race or color shall be abolished."* [20]

Senator Trumbull several times reiterated this view. On February 2, replying to Senator Davis of Kentucky, he said:

"Why, sir, *if the State of Kentucky makes no discrimination in civil rights between its citizens, this bill has no operation whatever in the State of Kentucky.* Are all the rights of the people of Kentucky gone because they cannot discriminate and punish one man for doing a thing that they do not punish another for doing? The bill draws to the Federal

---

affect persons other than "officers" in spite of its "under color" language, for it was there said in dictum that:

"The Civil Rights Bill . . . is analogous . . . to [a law] under the original Constitution, declaring that the validity of contracts should not be impaired, and that if *any person* bound by a contract should refuse to comply with it, *under color or pretence that it had been rendered void or invalid by a State law,* he should be liable to an action upon it in the courts of the United States, *with the addition of a penalty for setting up such an unjust and unconstitutional defence."* 109 U. S., at 17. (Emphasis added.)

[20] Cong. Globe, 39th Cong., 1st Sess., 476. (Emphasis added.)

Government no power whatever if the States will perform their constitutional obligations." [21]

On April 4, after the President's veto of the bill, Senator Trumbull stated that "If an offense is committed against a colored person simply because he is colored, in a State where the law affords him the same protection as if he were white, this act neither has nor was intended to have anything to do with his case, because he has adequate remedies in the State courts . . . ." [22] Later the same day, he said:

> "This bill in no manner interferes with the municipal regulations of any State which protects all alike in their rights of person and property. *It could have no operation in Massachusetts, New York, Illinois, or most of the States of the Union.*" [23]

The remarks just quoted constitute the plainest possible statement that the civil rights bill was intended to apply only to state-sanctioned conduct and not to purely private action. The Court has attempted to negate the force of these statements by citing other declarations by Senator Trumbull and others that the bill would operate everywhere in the country. See *ante,* at 426, n. 35. However, the obvious and natural way to reconcile these two sets of statements is to read the ones about the bill's nationwide application as declarations that the enactment of a racially discriminatory law in any State would bring the bill into effect there. [24] It seems to me that

---

[21] *Id.,* at 600. (Emphasis added.)

[22] *Id.,* at 1758.

[23] *Id.,* at 1761. (Emphasis added.)

[24] Moreover, a few Northern States apparently did have laws which denied to Negroes rights enumerated in the Act. See G. Stephenson, *Race Distinctions in American Law* 36–39 (1910); L. Litwack, *North of Slavery: The Negro in the Free States, 1790–1860,* at 93–94 (1961).

very great weight must be given these statements of Senator Trumbull, for they were clearly made to reassure Northern and Border State Senators about the extent of the bill's operation in their States.

On April 4, Senator Trumbull gave two additional indications that the bill was intended to reach only state-sanctioned action. The first occurred during .Senator Trumbull's defense of the part of § 3 of the bill which gave federal courts jurisdiction "of all causes, civil and criminal, affecting persons who are denied or cannot enforce in the courts . . . of the State or locality where they may be any of the rights secured to them by the first section of this act . . . ." Senator Trumbull said:

> "If it be necessary in order to protect the freedman in his rights that he should have authority to go into the Federal courts in all cases where a custom prevails in a State, or where there is a statute-law of the State discriminating against him, I think we have the authority to confer that jurisdiction under the second clause of the [Thirteenth Amendment]."[25]

If the bill had been intended to reach purely private discrimination it seems very strange that Senator Trumbull did not think it necessary to defend the surely more dubious federal jurisdiction over cases involving no state action whatsoever. A few minutes later, Senator Trumbull reiterated that his reason for introducing the civil rights bill was to bring about "the passage of a law by Congress, securing equality in civil rights *when denied by State authorities* to freedmen and all other inhabitants of the United States . . . ."[26]

Thus, the Senate debates contain many explicit statements by the bill's own author, to whom the Senate natu-

---

[25] Cong. Globe, 39th Cong., 1st Sess., 1759.
[26] *Id.*, at 1760. (Emphasis added.)

rally looked for an explanation of its terms, indicating that the bill would prohibit only state-sanctioned discrimination.

The Court puts forward in support of its construction an impressive number of quotations from and citations to the Senate debates. However, upon more circumspect analysis than the Court has chosen to give, virtually all of these appear to be either irrelevant or equally consistent with a "state action" interpretation. The Court's mention, *ante,* at 427, of a reference in the Senate debates to "white employers who refused to pay their Negro workers" surely does not militate against a "state action" construction, since "state action" would include conduct pursuant to "custom," and there was a very strong "custom" of refusing to pay slaves for work done. The Court's citation, *ante,* at 427–428, of Senate references to "white citizens who assaulted Negroes" is not in point, for the debate cited by the Court concerned the Freedmen's bill, not the civil rights bill.[27] The former by its terms forbade discrimination pursuant to "prejudice," as well as "custom," and in any event neither bill provided a remedy for the victim of a racially motivated assault.[28]

The Court's quotation, *ante,* at 429–430, of Senator Trumbull's December 13 reference to the then-embryonic civil rights bill is also compatible with a "state action" interpretation, at least when it is recalled that the unedited quotation, see *supra,* at 455, includes a statement that

[27] See Cong. Globe, 39th Cong., 1st Sess., 339–340.

[28] The Court also gives prominence, see *ante,* at 428–429, to a report by General Carl Schurz which described private as well as official discrimination against freedmen in the South. However, it is apparent that the Senate regarded the report merely as background, and it figured relatively little in the debates. Moreover, to the extent that the described discrimination was the product of "custom," it would have been prohibited by the bill.

the second clause of the Thirteenth Amendment, the authority for the proposed bill, was intended solely as a check on state legislatures. Senator Trumbull's declaration the following day that the forthcoming bill would be aimed at discrimination pursuant to "a prevailing public sentiment" as well as to legislation, see *ante,* at 431, is also consistent with a "state action" reading of the bill, for the bill explicitly prohibited actions done under color of "custom" as well as of formal laws.

The three additional statements of Senator Trumbull and the remarks of senatorial opponents of the bill, quoted by the Court, *ante,* at 431–433, to show the bill's sweeping scope, are entirely ambiguous as to whether the speakers thought the bill prohibited only state-sanctioned conduct or reached wholly private action as well. Indeed, if the bill's opponents thought that it would have the latter effect, it seems a little surprising that they did not object more strenuously and explicitly.[29] The remark of Senator Lane which is quoted by the Court, *ante,* at 433, to prove that he viewed the bill as reaching " 'the white man . . . [who] would invoke the power of local prejudice' against the Negro," seems to have been quoted out of context. The quotation is taken from a part of Senator Lane's speech in which he defended the section of the bill permitting the President to invoke military authority when necessary to enforce the bill. After noting that there might be occasions "[w]here organized resistance to the legal authority assumes that shape that the officers cannot execute a writ," [30] Senator Lane concluded that "if [the white man] would invoke the power of local prejudice to override the laws of the country, this is no Government unless the military may be called in to enforce the order of the

---

[29] See *infra,* at 473–475.

[30] Cong. Globe, 39th Cong., 1st Sess., 603.

civil courts and obedience to the laws of the country." [31]
It seems to me manifest that, taken in context, this
remark is beside the point in this case.

The post-veto remarks of opponents of the bill, cited
by the Court, *ante,* at 435, also are inconclusive. Once it
is recognized that the word "right" as used in the bill is
ambiguous, then Senator Cowan's statement, *ante,* at 435,
that the bill would confer "the right . . . to purchase . . .
real estate . . . without any qualification" [32] must inevi-
tably share that ambiguity. The remarks of Senator
Davis, *ibid.,* with respect to rental of hotel rooms and
sale of church pews are, when viewed in context, even
less helpful to the Court's thesis. For these comments
were made immediately following Senator Davis' plain-
tive acknowledgment that "this measure proscribes all
discriminations . . . that may be made . . . by any 'ordi-
nance, regulation, or custom,' as well as by 'law or stat-
ute.' " [33] Senator Davis then observed that ordinances,
regulations, and customs presently conferred upon white
persons the most comfortable accommodations in ships
and steamboats, hotels, churches, and railroad cars, and
stated that "[t]his bill . . . declares all persons who en-
force those distinctions to be criminals against the United
States . . . ." [34] Thus, Senator Davis not only tied these
obnoxious effects of the bill to its "customs" provision
but alleged that they were brought about by § 2 as well
as § 1. There is little wonder that his remarks "elicited
no reply," see *ibid.,* from the bill's supporters.

The House debates are even fuller of statements indi-
cating that the civil rights bill was intended to reach only
state-endorsed discrimination. Representative Wilson

---

[31] *Ibid.*

[32] See Cong. Globe, 39th Cong., 1st Sess., 1781.

[33] Cong. Globe, 39th Cong., 1st Sess., Appendix, 183.

[34] *Ibid.*

was the bill's sponsor in the House. On the very first day of House debate, March 1, Representative Wilson said in explaining the bill:

> "[I]f the States, seeing that we have citizens of different races and colors, would but shut their eyes to these differences and legislate, so far at least as regards civil rights and immunities, as though all citizens were of one race or color, our troubles as a nation would be well-nigh over. . . . It will be observed that *the entire structure of this bill rests on the discrimination relative to civil rights and immunities made by the States* on 'account of race, color, or previous condition of slavery.' " [35]

A few minutes later, Representative Wilson said:

> "Before our Constitution was formed, the great fundamental rights [which are embodied in this bill] belonged to every person who became a member of our great national family. . . . The entire machinery of government . . . was designed, among other things, to secure a more perfect enjoyment of these rights. . . . I assert that we possess the power to do those things which Governments are organized to do; *that we may protect a citizen of the United States against a violation of his rights by the law of a single State;* . . . that this power permeates our whole system, is a part of it, without which the States can run riot over every fundamental right belonging to citizens of the United States . . . ." [36]

These statements surely imply that Representative Wilson believed the bill to be aimed at state-sanctioned discrimination and not at purely private discrimination,

---

[35] Cong. Globe, 39th Cong., 1st Sess., 1118. (Emphasis added.)

[36] *Id.*, at 1119. (Emphasis added.)

which of course existed unhindered "[b]efore our Constitution was formed."

Other congressmen expressed similar views. On March 2, Representative Thayer, one of the bill's supporters, said:

> "The events of the last four years . . . have changed [the freedmen] from a condition of slavery to that of freedom. The practical question now to be decided is whether they shall be in fact freemen. It is whether they shall have the benefit of this great charter of liberty given to them by the American people.
>
> "Sir, *if it is competent for the new-formed Legislatures of the rebel States to enact laws* . . . which declare, for example, that they shall not have the privilege of purchasing a home for themselves and their families; . . . then I demand to know, of what practical value is the amendment abolishing slavery . . . ?" [37]

A few minutes later, he said:

> "Do you give freedom to a man when you allow him to be deprived of those great natural rights to which every man is entitled by nature? . . . [W]hat kind of freedom is that by which the man placed in a state of freedom is subject to the tyranny of *laws* which deprive him of [those] rights . . . ?" [38]

A little later, Representative Thayer added:

> "[The freedmen] are entitled to the benefit of that guarantee of the Constitution which secures to every citizen the enjoyment of life, liberty, and property, and no just reason exists why they should not enjoy the protection of that guarantee . . . .

---

[37] *Id.*, at 1151. (Emphasis added.)
[38] *Id.*, at 1152. (Emphasis added.)

"What is the necessity which gives occasion for that protection? Sir, in at least six of the lately rebellious States *the reconstructed Legislatures of those States have enacted laws* which, if permitted to be enforced, would strike a fatal blow at the liberty of the freedmen . . . ." [39]

An opponent of the bill, Representative Bingham, said on March 9:

"[W]hat, then, is proposed by the provision of the first section? *Simply to strike down by congressional enactment every State constitution which makes a discrimination on account of race or color* in any of the civil rights of the citizen." [40]

Representative Shellabarger, a supporter of the bill, discussed it on the same day. He began by stating that he had no doubt of the constitutionality of § 2 of the bill, provided Congress might enact § 1. With respect to § 1, he said:

"Its whole effect is not to confer or regulate rights, but to require that whatever of these enumerated rights and obligations are imposed by State laws shall be for and upon all citizens alike . . . . Self-evidently this is the whole effect of this first section. It secures . . . equality of protection in those enumerated civil rights which the States may deem proper to confer upon any races. . . . It must . . . be noted that the violations of citizens' rights, which are reached and punished by this bill, are those which are inflicted under 'color of law,' &c. The bill does not reach mere private wrongs, but only those done under color of state authority . . . . [I]ts whole force is expended in defeating an attempt, under State laws, to deprive races and the

[39] *Id.*, at 1153. (Emphasis added.)
[40] *Id.*, at 1291. (Emphasis added.)

members thereof as such of the rights enumerated in this act. This is the whole of it." [41]

Thus, Representative Shellabarger said in so many words that the bill had no impact on "mere private wrongs."

After the President's veto of the bill, Representative Lawrence, a supporter, stated his views. He said:

> "The bill does not declare who shall or shall not have the right to sue, give evidence, inherit, purchase, and sell property. These questions are left to the States to determine, subject only to the limitation that there are some inherent and inalienable rights pertaining to every citizen, which cannot be abolished or abridged by State constitutions or laws. . . .
>
> "Now, there are two ways in which a State may undertake to deprive citizens of these . . . rights: either by prohibitory laws, or by a failure to protect any one of them.
>
> "If the people of a State should become hostile to a large class of naturalized citizens *and should enact laws* to prohibit them and no other citizens . . . from inheriting, buying, holding, or selling property, . . . that would be prohibitory legislation. If the State *should simply enact laws* for native-born citizens *and provide no law* under which naturalized citizens could enjoy any one of these rights, and should deny them all protection by civil process or penal enactments, that would be a denial of justice." [42]

---

[41] *Id.,* at 1293–1294. It is quite clear that Representative Shellabarger was speaking of the bill's first section, for he did not mention the second section until later in his speech, and then only briefly and in terms which indicated that he thought it co-extensive with the first ("I cannot remark on the second section further than to say that it is the ordinary case of providing punishment for violating a law of Congress."). See *id.,* at 1294.

[42] Cong. Globe, 39th Cong., 1st Sess., 1832–1833. (Emphasis added.)

From this passage it would appear that Representative Lawrence conceived of the word "right" in § 1 of the bill as referring to a right to equal legal status, and that he believed that the sole effect of the bill was to prohibit state-imposed discrimination.

The Court quotes and cites a number of passages from the House debates in aid of its construction of the bill. As in the case of the Senate debates, most of these appear upon close examination to provide little support. The first significant citation, *ante,* at 425, n. 33, is a dialogue between Representative Wilson and Representative Loan, another of the bill's supporters.

The full exchange went as follows:

> "Mr. LOAN. Mr. Speaker, I . . . ask the chairman . . . why the committee limit the provisions of the second section to those who act under the color of law. Why not let them apply to the whole community where the acts are committed?
>
> "Mr. WILSON, of Iowa. That grows out of the fact that there is discrimination in reference to civil rights under the local laws of the States. Therefore we provide that the persons who under the color of these local laws should do these things shall be liable to this punishment.
>
> "Mr. LOAN. What penalty is imposed upon others than officers who inflict these wrongs on the citizen?
>
> "Mr. WILSON, of Iowa. We are not making a general criminal code for the States.
>
> "Mr. LOAN. Why not abrogate those laws instead of inflicting penalties upon officers who execute writs under them?
>
> "Mr. WILSON, of Iowa. A law without a sanction is of very little force.
>
> "Mr. LOAN. Then why not put it in the bill directly?

"Mr. WILSON, of Iowa. That is what we are trying to do." [43]

The interpretation which the Court places on Representative Wilson's remarks, see *ante,* at 425, n. 33, is a conceivable one.[44] However, it is equally likely that, since both participants in the dialogue professed concern solely with § 2 of the bill, their remarks carried no implication about the scope of § 1. Moreover, it is possible to read the entire exchange as concerned with discrimination in communities having discriminatory laws, with Representative Loan urging that the laws should be abrogated directly or that all persons, not merely officers, who discriminated pursuant to them should be criminally punishable.

The next significant reliance upon the House debates is the Court's mention of references in the debates "to white employers who refused to pay their Negro workers, white planters who agreed among themselves not to hire freed slaves without the permission of their former masters, white citizens who assaulted Negroes or who combined to drive them out of their communities." *Ante,* at 427–428.[45] (Footnotes omitted.) As was pointed out in the discussion of the Senate debates, *supra,* at 462, the references to white men's refusals to pay freedmen

---

[43] *Id.,* at 1120.

[44] It is worthy of note, however, that if Representative Wilson believed that § 2 of the bill would apply only to state officers, and not to other members of the community, he apparently differed from the bill's author. See the remarks of Senator Trumbull quoted, *supra,* at 458.

[45] The Court's reliance, see *ante,* at 425, n. 33, on the statement of Representative Shellabarger that "the violations of citizens' rights, which are reached and punished by this bill, are those which are . . . done under color of state authority . . . ," Cong. Globe, 39th Cong., 1st Sess., 1294, seems very misplaced when the statement is taken in context. A fuller version of Representative Shellabarger's remarks will be found, *supra,* at 467–468.

and their agreements not to hire freedmen without their "masters'" consent are by no means contrary to a "state action" view of the civil rights bill, since the bill expressly forbade action pursuant to "custom" and both of these practices reflected "customs" from the time of slavery. The Court cites two different House references to assaults on Negroes by whites. The first was by Congressman Windom,[46] and close examination reveals that his only mention of assaults was with regard to a Texas "pass system," under which freedmen were whipped if found abroad without passes, and a South Carolina law permitting freedmen to be whipped for insolence.[47] Since these assaults were sanctioned by law, or at least by "custom," they would be reached by the bill even under a "state action" interpretation. The other allusion to assaults, as well as the mention of combinations of whites to drive freedmen from communities, occurred in a speech by Representative Lawrence.[48] These references were shortly preceded by the remarks of Congressman Lawrence quoted, *supra,* at 468, and were immediately followed by his comment that *"If States should undertake to authorize such offenses, or deny to a class of citizens all protection against them,* we may then inquire whether the nation itself may be destroyed . . . ."[49] These fore and aft remarks imply that Congressman Lawrence's concern was that the activities referred to would receive state sanction.

The Court, *ante,* at 428, n. 40, quotes a statement of Representative Eldridge, an opponent of the bill, in which he mentioned references by the bill's supporters to "individual cases of wrong perpetrated upon

---

[46] See Cong. Globe, 39th Cong., 1st Sess., 1160.

[47] See *ibid.*

[48] See Cong. Globe, 39th Cong., 1st Sess., 1835.

[49] *Ibid.* (Emphasis added.)

the freedmen of the South . . . ." [50]   However, up to
that time there had been no mention whatever in the
House debates of any purely private discrimination,[51]
so one can only conclude that by "individual cases" Rep-
resentative Eldridge meant "isolated cases," not "cases
of purely private discrimination."

The last significant reference [52] by the Court to the
House debates is its statement, *ante,* at 434, that "Rep-
resentative Cook of Illinois thought that, without appro-
priate federal legislation, any 'combination of men in
[a] neighborhood [could] prevent [a Negro] from hav-
ing any chance' to enjoy" the benefits of the Thirteenth
Amendment.   This quotation seems to be taken out
of context.   What Representative Cook said was:

> "[W]hen those rights which are enumerated in this
> bill are denied to any class of men on account of race
> or color, *when they are subject to a system of
> vagrant laws* which sells them into slavery or invol-
> untary servitude, which operates upon them as upon
> no other part of the community, they are not se-
> cured in the rights of freedom.   If a man can be
> sold, the man is a slave.   If he is nominally freed
> by the amendment to the Constitution, . . . he has
> simply the labor of his hands on which he can
> depend.   Any combination of men in his neighbor-
> hood can prevent him from having any chance to
> support himself by his labor.   *They can pass a law*
> that a man not supporting himself by labor shall

---

[50] Cong. Globe, 39th Cong., 1st Sess., 1156.

[51] See *id.,* at 1115–1124, 1151–1155.

[52] The emphasis given by the Court to the statement of Repre-
sentative Thayer which is quoted, *ante,* at 433–434, surely evaporates
when the statement is viewed in conjunction with Representative
Thayer's immediately following remarks, quoted, *supra,* at 466–467.

be deemed a vagrant, and that a vagrant shall be sold." [53]

These remarks clearly were addressed to discriminations effectuated by law, or sanctioned by "custom." As such, they would have been reached by the bill even under a "state action" interpretation.

## D.

The foregoing analysis of the language, structure, and legislative history of the 1866 Civil Rights Act shows, I believe, that the Court's thesis that the Act was meant to extend to purely private action is open to the most serious doubt, if indeed it does not render that thesis wholly untenable. Another, albeit less tangible, consideration points in the same direction. Many of the legislators who took part in the congressional debates inevitably must have shared the individualistic ethic of their time, which emphasized personal freedom [54] and embodied a distaste for governmental interference which was soon to culminate in the era of laissez-faire. [55] It seems to me that most of these men would have regarded

---

[53] *Id.*, at 1124. (Emphasis added.) Earlier in the same speech, Representative Cook had described actual vagrancy laws which had recently been passed by reconstructed Southern legislatures. See *id.*, at 1123–1124.

[54] An eminent American historian has said that the events of the last third of the 19th century took place "in a framework of pioneer individualistic mores . . . ." S. Morison, The Oxford History of the American People 788 (1965). See also 3 V. Parrington, Main Currents in American Thought 7–22 (1930).

[55] It has been suggested that the effort of the congressional radicals to enact a program of land reform in favor of the freedmen during Reconstruction failed in part because it smacked too much of "paternalism" and interference with property rights. See K. Stampp, The Era of Reconstruction 126–131 (1965).

it as a great intrusion on individual liberty for the Government to take from a man the power to refuse for personal reasons to enter into a purely private transaction involving the disposition of property, albeit those personal reasons might reflect racial bias. It should be remembered that racial prejudice was not uncommon in 1866, even outside the South.[56] Although Massachusetts had recently enacted the Nation's first law prohibiting racial discrimination in public accommodations,[57] Negroes could not ride within Philadelphia streetcars[58] or attend public schools with white children in New York City.[59] Only five States accorded equal voting rights to Negroes,[60] and it appears that Negroes were allowed to serve on juries only in Massachusetts.[61] Residential segregation was the prevailing pattern almost every-

---

[56] See generally M. Konvitz & T. Leskes, A Century of Civil Rights (1961); L. Litwack, North of Slavery: The Negro in the Free States, 1790–1860 (1961); K. Stampp, *supra*, at 12–17; G. Stephenson, Race Distinctions in American Law (1910); Maslow & Robison, Civil Rights Legislation and the Fight for Equality, 1862–1952, 20 U. Chi. L. Rev. 363 (1953).

[57] See M. Konvitz & T. Leskes, *supra*, at 155–156; 1864–1865 Mass. Acts and Resolves 650.

[58] Negroes were permitted to ride only on the front platforms of the cars. See L. Litwack, *supra*, at 112.

[59] Negro students in New York City were compelled to attend separate schools, called African schools, under authority of an 1864 New York State statute which empowered school officials to establish separate, equal schools for Negro children. See L. Litwack, *supra*, at 121, 133–134, 136, 151; G. Stephenson, *supra*, at 185; 1864 N. Y. Laws 1281. In 1883, the New York Court of Appeals held that students in Brooklyn might constitutionally be segregated pursuant to the statute. See *People ex rel. King* v. *Gallagher*, 93 N. Y. 438. In 1900, the statute was finally repealed and segregation legally forbidden. See 1900 N. Y. Laws, Vol. II, at 1173.

[60] See L. Litwack, *supra*, at 91–92. The States were Massachusetts, Rhode Island, Maine, New Hampshire, and Vermont. See *id.*, at 91.

[61] See L. Litwack, *supra*, at 94.

where in the North.[62]  There were no state "fair housing" laws in 1866, and it appears that none had ever been proposed.[63]  In this historical context, I cannot conceive that a bill thought to prohibit purely private discrimination not only in the sale or rental of housing but in *all* property transactions would not have received a great deal of criticism explicitly directed to this feature. The fact that the 1866 Act received *no* criticism of this kind [64] is for me strong additional evidence that it was not regarded as extending so far.

In sum, the most which can be said with assurance about the intended impact of the 1866 Civil Rights Act upon purely private discrimination is that the Act probably was envisioned by most members of Congress as prohibiting official, community-sanctioned discrimination in the South, engaged in pursuant to local "customs" which in the recent time of slavery probably were embodied in laws or regulations.[65]  Acts done under the

---

[62] See *id.*, at 168–170.

[63] It has been noted that:

"Residential housing, despite its importance . . . , appears to be the last of the major areas of discrimination that the states have been willing to attack."  M. Konvitz & T. Leskes, *supra*, at 236.

And as recently as 1953, it could be said:

"Bills have been introduced in state legislatures to forbid racial or religious discrimination in 'multiple dwellings' (those housing three or more families), . . . but these proposals have not been considered seriously by any legislative body."  Maslow & Robison, *supra*, at 408.  (Footnotes omitted.)

[64] In contrast, the bill was repeatedly and vehemently attacked, in the face of emphatic denials by its sponsors, on the ground that it allegedly would invalidate two types of *state laws:* those denying Negroes equal voting rights and those prohibiting intermarriage. See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., 598, 600, 604, 606, 1121, 1157, 1263.

[65] The petitioners do not argue, and the Court does not suggest, that the discrimination complained of in this case was the product of such a "custom."

color of such "customs" were, of course, said by the Court in the *Civil Rights Cases,* 109 U. S. 3, to constitute "state action" prohibited by the Fourteenth Amendment. See *id.,* at 16, 17, 21. Adoption of a "state action" construction of the Civil Rights Act would therefore have the additional merit of bringing its interpretation into line with that of the Fourteenth Amendment, which this Court has consistently held to reach only "state action." This seems especially desirable in light of the wide agreement that a major purpose of the Fourteenth Amendment, at least in the minds of its congressional proponents, was to assure that the rights conferred by the then recently enacted Civil Rights Act could not be taken away by a subsequent Congress.[66]

## II.

The foregoing, I think, amply demonstrates that the Court has chosen to resolve this case by according to a loosely worded statute a meaning which is open to the strongest challenge in light of the statute's legislative history. In holding that the Thirteenth Amendment is sufficient constitutional authority for § 1982 as interpreted, the Court also decides a question of great importance. Even contemporary supporters of the aims of the 1866 Civil Rights Act doubted that those goals could constitutionally be achieved under the Thirteenth Amendment,[67] and this Court has twice expressed similar

---

[66] See, *e. g.,* H. Flack, The Adoption of the Fourteenth Amendment 94 (1908); J. James, The Framing of the Fourteenth Amendment 126–128, 179 (1956); 2 S. Morison & H. Commager, The Growth of the American Republic 39 (4th ed. 1950); K. Stampp, *supra,* at 136; J. tenBroek, Equal Under Law 224 (1965); L. Warsoff, Equality and the Law 126 (1938).

[67] See, *e. g.,* Cong. Globe, 39th Cong., 1st Sess., 504–505 (Senator Johnson); *id.,* at 1291–1293 (Representative Bingham).

doubts. See *Hodges* v. *United States,* 203 U. S. 1, 16–18; *Corrigan* v. *Buckley,* 271 U. S. 323, 330. But cf. *Civil Rights Cases,* 109 U. S. 3, 22. Thus, it is plain that the course of decision followed by the Court today entails the resolution of important and difficult issues.

The only apparent way of deciding this case without reaching those issues would be to hold that the petitioners are entitled to relief on the alternative ground advanced by them: that the respondents' conduct amounted to "state action" forbidden by the Fourteenth Amendment. However, that route is not without formidable obstacles of its own, for the opinion of the Court of Appeals makes it clear that this case differs substantially from any "state action" case previously decided by this Court. See 379 F. 2d, at 40–45.

The fact that a case is "hard" does not, of course, relieve a judge of his duty to decide it. Since, the Court did vote to hear this case, I normally would consider myself obligated to decide whether the petitioners are entitled to relief on either of the grounds on which they rely. After mature reflection, however, I have concluded that this is one of those rare instances in which an event which occurs after the hearing of argument so diminishes a case's public significance, when viewed in light of the difficulty of the questions presented, as to justify this Court in dismissing the writ as improvidently granted.

The occurrence to which I refer is the recent enactment of the Civil Rights Act of 1968, Pub. L. 90–284, 82 Stat. 73. Title VIII of that Act contains comprehensive "fair housing" provisions, which by the terms of § 803 will become applicable on January 1, 1969, to persons who, like the petitioners, attempt to buy houses from developers. Under those provisions, such persons will be entitled to injunctive relief and damages from developers

who refuse to sell to them on account of race or color, unless the parties are able to resolve their dispute by other means. Thus, the type of relief which the petitioners seek will be available within seven months' time under the terms of a presumptively constitutional Act of Congress.[68] In these circumstances, it seems obvious that the case has lost most of its public importance, and I believe that it would be much the wiser course for this Court to refrain from deciding it. I think it particularly unfortunate for the Court to persist in deciding this case on the basis of a highly questionable interpretation of a sweeping, century-old statute which, as the Court acknowledges, see *ante,* at 415, contains none of the exemptions which the Congress of our own time found it necessary to include in a statute regulating relationships so personal in nature. In effect, this Court, by its construction of § 1982, has extended the coverage of federal "fair housing" laws far beyond that which Congress in its wisdom chose to provide in the Civil Rights Act of 1968. The political process now having taken hold again in this very field, I am at a loss to understand why the Court should have deemed it appropriate or, in the circumstances of this case, necessary to proceed with such precipitate and insecure strides.

I am not dissuaded from my view by the circumstance that the 1968 Act was enacted after oral argument in this case, at a time when the parties and *amici curiae* had invested time and money in anticipation of a decision on the merits, or by the fact that the 1968 Act apparently will not entitle these petitioners to the relief which they seek.[69] For the certiorari jurisdiction was not

---

[68] Of course, the question of the constitutionality of the "fair housing" provisions of the 1968 Civil Rights Act is not before us, and I intend no implication about how I would decide that issue.

[69] See *ante,* at 417, n. 21.

conferred upon this Court "merely to give the defeated party in the . . . Court of Appeals another hearing," *Magnum Co.* v. *Coty,* 262 U. S. 159, 163, or "for the benefit of the particular litigants," *Rice* v. *Sioux City Cemetery,* 349 U. S. 70, 74, but to decide issues, "the settlement of which is of importance to the public as distinguished from . . . the parties," *Layne & Bowler Corp.* v. *Western Well Works, Inc.,* 261 U. S. 387, 393. I deem it far more important that this Court should avoid, if possible, the decision of constitutional and unusually difficult statutory questions than that we fulfill the expectations of every litigant who appears before us.

One prior decision of this Court especially suggests dismissal of the writ as the proper course in these unusual circumstances. In *Rice* v. *Sioux City Cemetery, supra,* the issue was whether a privately owned cemetery might defend a suit for breach of a contract to bury on the ground that the decedent was a Winnebago Indian and the contract restricted burial privileges to Caucasians. In considering a petition for rehearing following an initial affirmance by an equally divided Court, there came to the Court's attention for the first time an Iowa statute which prohibited cemeteries from discriminating on account of race, but which would not have benefited the *Rice* petitioner because of an exception for "pending litigation." Mr. Justice Frankfurter, speaking for a majority of the Court, held that the writ should be dismissed. He pointed out that the case presented "evident difficulties," 349 U. S., at 77, and noted that "[h]ad the statute been properly brought to our attention . . . , the case would have assumed such an isolated significance that it would hardly have been brought here in the first instance." *Id.,* at 76–77. This case certainly presents difficulties as substantial as those in *Rice.* Compare what has been said in this opinion with 349 U. S.,

at 72–73; see also *Bell* v. *Maryland,* 378 U. S. 226. And if the petition for a writ of certiorari in this case had been filed a few months after, rather than a few months before, the passage of the 1968 Civil Rights Act, I venture to say that the case would have been deemed to possess such "isolated significance," in comparison with its difficulties, that the petition would not have been granted.

For these reasons, I would dismiss the writ of certiorari as improvidently granted.